IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Kelly Foust,                                    Case No. 1:06 CV 2625

                    Petitioner,                 MEMORANDUM OPINION
                                                AND ORDER
            -vs-
                                                JUDGE JACK ZOUHARY
Marc C. Houk, Warden,

                    Respondent.


        This matter is before the Court upon Petitioner Kelly Foust's ("Foust" or "Petitioner") Petition

for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 filed with this Court on March 22, 2007

(Doc. No. 12).  Foust challenges his convictions and death sentence for the aggravated murder of Jose

Coreano imposed by the Court of Common Pleas of Cuyahoga County, Ohio.  The Court has before

it the Petition, Respondent Marc Houk's ("Respondent") Return of Writ (Doc. No. 15), Foust's

Traverse (Doc. No. 28), and Respondent's Reply to the Traverse (Doc. No. 29).  For the following

reasons, the Petition for Writ of Habeas Corpus is denied.

                              FACTUAL BACKGROUND

        The facts taken from *State v. Foust,* 105 Ohio St. 3d 137, 137-40 (2004) are as follows:

        In this appeal, defendant-appellant, Kelly Foust, raises 13 propositions of law.
        Finding none meritorious, we affirm his convictions.  We have independently weighed
        the aggravating circumstances against the mitigating factors and have compared his
        sentence to those imposed in similar cases, as R.C. 2929.05(A) requires.  As a result,
        we affirm Foust's sentence of death.

During the early morning of March 31, 2001, Foust broke into the home of 54-year-old Jose Coreano in Cleveland. Foust entered Jose's first-floor bedroom and killed him with a hammer blow to the head. Foust then went upstairs and repeatedly raped Jose's 17-year-old daughter, Damaris Coreano. After stealing items from the house, Foust tied Damaris to the bathtub and set the house on fire; despite her situation, Damaris managed to escape.

A three-judge panel convicted Foust of the aggravated murder of Jose, the kidnapping, rape, gross sexual imposition, and attempted murder of Damaris, and aggravated burglary, aggravated robbery, and aggravated arson. Foust was sentenced to death. To establish Foust's guilt, the state introduced Foust's pretrial confession, testimony from Damaris identifying Foust as her assailant, and the murder weapon containing Foust's DNA.

### *State's Case*

Foust was distraught after his relationship with his girlfriend, Janira Acevedo, came to an end. Damaris and her sister, Cheyla Coreano, were friends with Acevedo. After Foust and Acevedo broke up, Acevedo began staying at the Coreano home.

Sometime before March 28, 2001, Foust broke into the Coreano home. On March 28, Jose, Cheyla, and Acevedo went to the police, seeking a restraining order against Foust. They did not receive a restraining order, but the police offered to send a patrol car to their residence. Jose, however, refused this offer.

During the early morning hours of March 31, Foust had been drinking beer and wine and "getting pretty wasted." At some point, Foust went looking for Acevedo at a home on Sackett Avenue, where he thought she was staying. Foust peeked into a window of that home and realized that Acevedo was not there. Foust later explained, "I got really mad because [Acevedo] told me she stays there every night and doesn't go anywhere."

Foust then went to the Coreano home and gained entry through an open basement window. Foust found Damaris sleeping upstairs but did not locate Cheyla or Acevedo. Foust then went to Jose's bedroom on the first floor and struck Jose on the head with a claw hammer.

Foust returned to the second-floor bedroom where Damaris was sleeping and got on top of her. When she awakened, Foust put a knife to her neck, shoved her face into the pillow, and ordered her to lie on her stomach. She tried to grab the knife, but Foust told her not to be a hero because "in reality heroes die." Foust asked Damaris for "the money," and she said, "[W]hat money?" Foust threatened to kill her if she did not tell him where the money was, and as a result, she said that she had a dollar and told him where he could find it.

Foust asked Damaris if she was a virgin.  Damaris told Foust that she was not, hoping that he would leave her alone.  Foust removed Damaris's clothing and tied her hands behind her back.  Foust then ordered her to perform oral sex.  When she refused, he pointed his knife at her neck and asked her if she wanted her father to live.  Damaris then performed oral sex on him.

After this, Foust untied her hands and ordered her to lie on her back.  He vaginally raped her multiple times and also touched her breasts and put his fingers on her vagina. She saw his face during these rapes.  When he finished, he ordered her not to move and left the bedroom.

Shortly thereafter, Foust returned to the bedroom and vaginally raped her again. Damaris asked why he was "doing this to a Christian," and he replied that if she was a real Christian, she would forgive him.  Foust then ordered her to get on her knees and pray out loud for him.  While on her knees, Damaris prayed that God would help him realize what he was doing.   Foust told Damaris to shut up, put her back on the bed, and raped her again.

After that, Foust took Damaris into her sister's bedroom.  Although Foust had placed a shirt over her head, Damaris saw Foust take several things from her sister's room. Foust then forced Damaris into the bathroom and tied her hands and feet together with shoestrings. He then tied Damaris to the bathtub leg with a chain belt, told her not to move, and left the bathroom.

Later, Foust returned to the bathroom and accused her of moving around. He said, "[Y]ou think I'm playing with you," and cut one of her braids off.  Foust also touched her vagina with his knife and threatened to slice her open if she moved.

While Damaris was tied up in the bathroom, Foust started fires in Jose's downstairs bedroom and in the upstairs bedrooms of Cheyla and Damaris.  Afterwards, he took Jose's car keys, left the house, and drove Jose's car about two blocks, parked it on the street, and walked to a friend's house.

While tied up in the bathroom, Damaris smelled smoke, managed to move the shirt from her face, and saw that the house was on fire.  She freed herself by wiggling the belt loose from the bathtub leg.  She then crawled into her bedroom, maneuvered herself onto her bed, and let the fire on her mattress burn the shoelaces off her ankles and wrists.  Damaris put the fire out in her room and went downstairs to look for her father but could not find him. She then left the smoke-filled house and ran to a neighbor's home for help.

3

Police and firefighters arriving at the scene found the home engulfed in flames.  Jose's body, burned beyond recognition, was found on his bed.  Damaris told Patrolman William Hyland that "Kelly" had attacked her and started the fire. Although she was unsure of his last name, she thought it was "Foster or something like that." Hyland noticed that Damaris had shoelaces tied to her wrists.

After the fire was extinguished, police and fire personnel began collecting evidence from the house. Lt. Victor Gill, an arson investigator, determined that the fire had originated in the first-floor bedroom and the two second-floor bedrooms. Investigations revealed two spent matches: one next to a box of matches on the kitchen floor and another on the carpet next to Damaris's bed.  Lt. Gill concluded that "there were at least three fires and each [had been] separately and intentionally set."

In the basement, police found Foust's left thumbprint on a water pipe near the basement window.  During a search of the house on April 6, 2001, police found a claw hammer underneath Damaris's bed.

After identifying Foust as the primary suspect, police began searching for him. On April 7, 2001, the police arrested Foust, and around 10:30 a.m., Detectives Denise Kovach and Michael Cipo interviewed Foust at the police station. After waiving his *Miranda* rights, Foust confessed to breaking into the home, hitting Jose, and raping Damaris.  However, Foust claimed that he "didn't intentionally want to do any harm" and said, "I really don't know what I was doing, just trying to find out where Janita [sic, Janira] was."

At trial, Julie Heinig, a DNA analyst, testified that a preliminary examination of the hammer revealed blood on the hammer claw.  According to Heinig, "The DNA profile obtained from the blood on the hammer matched the DNA profile of Jose Coreano." The handle of the hammer was also tested and revealed a DNA mixture to which Foust could not be excluded as a contributor.

Joseph Serowik, a scientific examiner for the Cleveland Police Department, examined a rape kit containing blood, hair, and swab samples obtained from Damaris. Examination of the vaginal swab sample revealed sperm cells and seminal fluid. Testing of rectal swabs showed the presence of seminal fluid and blood.  Due to administrative problems at the lab, however, DNA testing was not conducted on this evidence.

Dr. William Bligh-Glover, a deputy coroner for Cuyahoga County, performed an autopsy on Jose Coreano and concluded that Jose had fourth-degree burns over 100 percent of his body and had "suffered blunt force trauma to his head with soft tissue skull and brain injuries." He further testified that the hammer found in Damaris's bedroom could have caused the circular fracture on Jose's skull.  Dr. Bligh-Glover concluded that Jose's death was caused by the blunt impact to the head and that the

4

burns occurred after death.  He reached this conclusion because no carbon monoxide had been found in Jose's blood, and high levels of carbon monoxide would normally be found in the blood of a person who had died from smoke inhalation.  Also, he found no soot in Jose's lungs.

The defense presented no evidence during the guilt phase of trial.

## PROCEDURAL HISTORY

On April 10, 2001, the Cuyahoga County, Ohio Grand Jury returned a twenty-six count indictment against Foust charging him with six counts of aggravated murder, each containing seven identical death penalty specifications alleging: murder (1) as part of a "course of conduct," Ohio Revised Code § 2929.04(A)(5); (2) while committing aggravated burglary, Ohio Revised Code § 2929.04(A)(7); (3) while committing aggravated robbery, Ohio Revised Code § 2911.01; (4) while committing a kidnaping, Ohio Revised Code § 2929.04(A)(7); (5) while committing rape, Ohio Revised Code § 2907.02; and (6) while committing aggravated arson, Ohio Revised Code § 2929.04(A)(7).  Count 7 charged Foust with attempted murder of Demaris Coreano, Ohio Revised Code § 2923.02.[1]  Count 8 charged him with aggravated burglary, Ohio Revised Code § 2911.11. Counts 9 and 10 charged him with aggravated robbery, Ohio Revised Code § 2911.01.  Counts 11 through 22 concerned crimes against Demaris Coreano: one count of kidnaping, Ohio Revised Code § 2905.01; eight counts of rape, Ohio Revised Code § 2907.02; and three counts of gross sexual imposition, Ohio Revised Code § 2907.02.  In Count 23, Foust was indicted for aggravated arson as to Jose Coreano, Ohio Revised Code § 2909.02, and Count 24 was the same as to Demaris Coreano. Count 25 charged him with aggravated arson with risk of harm to a fireman, Ohio Revised Code §

---

[1]

The Ohio Supreme Court spelled Demaris incorrectly in its Opinion.

2909.02. Finally, Count 26 contained a charge of aggravated arson with physical harm to an occupied dwelling, Ohio Revised Code § 2909.02 (Apx. Vol. 1, pp.10-35).

Foust was arraigned on April 13, 2001 and pled not guilty to all charges (Apx. Vol.1, p. 47). The court appointed attorneys Charles Webster and Donald Butler. *Id*. Foust's Motion for an Independent Psychiatrist was granted on June 13, 2001, the same day that it was filed (Apx. Vol. 1, pp. 52-55). On December 3, 2001, he waived his right to a jury trial and elected to be tried by a three-judge panel (Apx. Vol. 1, p. 159). Then, on December 5, 2001, Foust filed a Motion to Suppress his Written and Oral Statements (Apx. Vol. 1, pp. 1611-65). Apparently the trial court overruled this Motion, although there is no indication in the Record.

A trial before the three-judge panel commenced on December 12, 2001 (Tr. Vol. 1, p. 62). On December 14, 2001, the court convicted Foust of the aggravated murder of Jose Coreano, the kidnapping, rape, gross sexual imposition and attempted murder of Demaris Coreano and aggravated burglary, aggravated robbery and aggravated arson (Tr. Vol. 2, pp. 470-76, Apx. Vol. 1, pp. 171-224). Foust's Motion for Directed Verdict of Acquittal was granted as to Counts 17, 18, 23 and 25 (Apx. Vol. 1, p. 169).

The sentencing phase of the trial began on January 7, 2002 (Tr. Vol. 2, p. 484). The court found the aggravated circumstances outweighed the mitigating factors and on January 11, 2002 returned a sentencing verdict of death for the murder of Jose Coreano (Tr. Vol. 2, pp. 611–28, Apx. Vol. 1, pp. 236-45).

### A.    Direct Appeal

Foust filed a timely Notice of Appeal to the Ohio Supreme Court on August 7, 2002 raising the following thirteen propositions of law (Apx. Vol. 2, p. 4).

6

Proposition of Law No. 1:  A capital defendant does not enter into a knowing, intelligent and voluntary waiver of his right to a jury unless that defendant is informed the waiver includes his right to have a jury decide his sentence in addition to his culpability.

Proposition of Law No. 2:  An indictment which fails to set forth each and every element of the charged offense is in violation of the Due Process Clause of both the State and Federal Constitution.

Proposition of Law No. 3:  Defense counsel renders ineffective assistance of counsel where counsel fail to seek funds to secure the service and assistance of experts necessary to properly defend their client, fail to object to the qualifications of state "expert" witnesses, fail to reasonably prepare for cross-examination of state expert witnesses, and fail to reasonably lodge objections to inadmissible testimony.

Proposition of Law No. 4:  The failure to instruct a suspect in a custodial setting that he may request counsel at any time during an interrogation and the police questioning must stop if counsel is requested renders a subsequent statement of that defendant invalid.

Proposition of Law No. 5:  Defense counsel renders ineffective assistance of counsel when counsel fails to effectively advocate a meritorious suppression of a defendant's statement taken in violation of *Miranda v. Arizona*.

Proposition of Law No. 6:  The failure to raise and preserve meritorious issues during the culpability phase results in the denial of a defendant's right to effective assistance of counsel.

Proposition of Law No. 7:  The failure to merge allied offenses is violative of the Confrontation Clause of both the Ohio and United States Constitutions.

Proposition of Law No. 8:  Defense counsel renders ineffective assistance of counsel during the mitigation phase of the trial by failing to properly prepare and present favorable evidence and by failing to object to the introduction of irrelevant evidence.

Proposition of Law No. 9:  Where the trial court fails to merge convictions before the penalty phase in a capital case, the resultant sentence is void or voidable as the weighing process is tainted with the consideration of improper aggravating factors.

Proposition of Law No. 10:  The trial court's failure to consider mitigating evidence in a capital sentencing renders the resultant sentence of death invalid.

7

Proposition of Law No. 11: The death penalty may not be sustained where the cumulative errors that occurred in the trial deprived the defendant of a fair consideration of the appropriateness of the death penalty.

Proposition of Law No. 12: The death penalty cannot be upheld where the reviewing court fails to follow the statutory provisions regarding the proportionality review of the defendant's sentence.

Proposition of Law No. 13: The death penalty is unconstitutional as presently administered in Ohio.

The Ohio Supreme Court affirmed the decision of the trial court on December 29, 2004 (Apx. Vol. 3, p. 144); *State v. Foust*, 105 Ohio St. 3d 137 (2004). Foust moved for reconsideration which was denied on March 2, 2005 (Apx. Vol. 3, p. 190).

### B.    Post-conviction Relief

While his direct appeal was pending, on May 9, 2003 Foust filed a Motion for Post-Conviction Relief with the trial court under Ohio Revised Code § 2953.21 raising the following sixteen causes of action (Apx. Vol. 4, pp. 19-275; Apx. Vol. 5, pp. 2-183).

First Cause of Action: Petitioner Foust's convictions and sentences are void or voidable because the prosecution withheld material evidence (Petition ¶28).

Second Cause of Action: Petitioner's conviction and sentence are void or voidable because his trial attorneys failed to inquire into Judge Robert Glickman's employment as an Assistant Cuyahoga County Prosecutor in order to determine whether to move for the recusal of Judge Glickman (Petition ¶37).

Third Cause of Action: Petitioner Foust's convictions and sentences are void or voidable because he was denied the effective assistance of counsel at the penalty phase (Petition ¶46).

Fourth Cause of Action: Petitioner's conviction and sentence are void or voidable because his trial attorneys failed to present evidence to support Petitioner's defense at the suppression hearing. This breach of duty prejudiced Petitioner because Petitioner's alleged statement was a key piece of evidence against him (Petition ¶58).

8

<u>Fifth Cause of Action</u>:  Petitioner's conviction and sentence are void or voidable because he was denied the effective assistance of counsel due to counsel's failure to obtain and utilize the expert services of a trained mitigation specialist at the penalty phase of his capital trial (Petition ¶67).

<u>Sixth Cause of Action</u>: Petitioner Foust's conviction and sentence are void or voidable because he was denied the effective assistance of counsel at the penalty phase (Petition ¶79).

<u>Seventh Cause of Action</u>:  Petitioner Foust's conviction and sentence are void or voidable because his attorneys rendered ineffective assistance due to the Prosecution's failure to disclose material evidence (Petition ¶89).

<u>Eighth Cause of Action</u>:  Petitioner's conviction and sentence are void or voidable because he did not receive effective assistance during his capital trial.  Trial counsel failed to discuss and properly advise Petitioner about his right to a jury trial and the repercussions of waiving a jury and trying his case before a three-judge panel (Petition ¶97).

<u>Ninth Cause of Action</u>:  Petitioner's convictions and sentence are void or voidable because the State withheld material evidence – inconsistent statements by the alleged rape victim (Petition ¶1)

<u>Tenth Cause of Action</u>:  Petitioner's conviction and sentence are void or voidable because the death penalty as administered by lethal injection in the state of Ohio violated his constitutional rights (Petition ¶113).

<u>Eleventh Cause of Action</u>:  Petitioner's judgment and sentence are void or voidable because, assuming *arguendo* that none of the grounds for relief in his post-conviction petition individually warrant the relief sought from this court, the cumulative effects of the errors and omissions presented in the petition's foregoing paragraphs have been prejudicial (Petition ¶120).  Further grounds set forth in amended post-conviction petition.[2]

<u>Twelfth Cause of Action</u>:  Petitioner's judgment and sentence are void or voidable because his trial attorneys failed to present evidence to support their argument that the death penalty is applied in an arbitrary manner (Amended Petition ¶124).

<u>Thirteenth Cause of Action</u>:  Petitioner's convictions and sentence are void or voidable because his death sentence was disproportionate to similarly situated capital defendants in Cuyahoga County Ohio (Amended Petition ¶133).

---

[2]

Petitioner filed an Amended Petition on June 4, 2003 (Apx. Vol. 5, pp. 184-240).

9

Fourteenth Cause of Action:  Petitioner's convictions and sentence are void or voidable because the death penalty law permits the imposition of capital punishment in an arbitrary, capricious and discriminatory manner due to the uncontrolled discretion afforded elected county prosecutors in determining when to seek the death penalty (Amended Petition ¶139).

Fifteenth Cause of Action:  Petitioner's convictions and sentence are void or voidable because the statutory proportionality reporting system for death penalty cases is inaccurately and ineffectively processed in Cuyahoga County, Ohio (Amended Petition ¶149).

Sixteenth Cause of Action:  Petitioner's judgment and sentence are void or voidable because his trial attorneys failed to investigate and present evidence at the culpability phase of his trial (Amended Petition ¶160).

The trial court denied the Petition for Post-conviction Relief on October 21, 2003 (Apx. Vol. 5, p. 346).  Thereafter, on November 13, 2003, Foust appealed to the Ohio Court of Appeals, Eighth Appellate District raising the following four assignments of error:

Assignment of Error I:  The trial court erred by dismissing appellant's post-conviction petition where he presented sufficient operative facts and supporting exhibits to merit an evidentiary hearing and discovery.

Issue presented:  In an action for post-conviction relief, a petition that presents sufficient operative facts supported by evidence *dehors* the record meets the required pleading standard and must not be summarily dismissed without a hearing.

Assignment of Error II:  The trial court erred by dismissing appellant's post-conviction petition where he presented sufficient operative facts and supporting exhibits to merit an evidentiary hearing and discovery.

Issue presented:  The doctrine of *res judicata* does not apply to claims in a post-conviction petition that could not be fully litigated on direct appeal and that were supported by credible evidence *dehors* the record.

Assignment of Error III:  Ohio's post-conviction procedures neither afford an adequate corrective process nor comply with due process and equal protection under the Fourteenth Amendment.

10

<u>Issue presented</u>:  When a petitioner has the burden of supporting grounds for relief with evidence outside the trial record, but is denied discovery, and the petition is summarily dismissed without a hearing, post-conviction in Ohio fails to provide an adequate remedy.

<u>Assignment of Error IV</u>:  Considered together, the cumulative errors set forth in appellant's substantive grounds for relief merit reversal or remand for a proper post-conviction process.

The court of appeals affirmed the trial court's decision on October 6, 2005 (Apx. Vol. 6, p. 4; Apx. Vol. 6, pp. 219-43).  *State v. Foust*, 2005 WL 2462048 (Ohio Ct. App. Oct 6, 2005).

On December 1, 2005, Foust filed a Notice of Appeal in the Ohio Supreme Court (Apx. Vol. 7, p. 3).  He raised the following four propositions of law:

<u>Proposition of Law No. I</u>:  The court of appeals erred by affirming the trial court's dismissal of appellant's post-conviction petition where he presented sufficient operative facts and supporting exhibits to merit an evidentiary hearing and discovery.

<u>Proposition of Law No. II</u>:  The court of appeals erred by affirming the trial court's dismissal of certain grounds for relief in appellant's post-conviction petition on the ground of *res judicata*.

<u>Proposition of Law No. III</u>:  Ohio's post-conviction procedures neither afford an adequate corrective process nor comply with due process and equal protection under the Fourteenth Amendment.

<u>Proposition of Law No. IV</u>:  Considered together, the cumulative errors set forth in appellant's substantive grounds for relief merit reversal or remand for a proper post-conviction process.

The Ohio Supreme Court affirmed the appellate court's decision on March 29, 2006 (Apx. Vol. 7, p. 126). On June 28, 2006, Foust filed a Petition for Writ of Certiorari with the United States Supreme Court (Apx. Vol. 7, p. 127). The Supreme Court denied the Petition on October 2, 2006. *Foust* v. *Ohio,* 127 S. Ct. 184 (2006).

**C.**     *Murnahan*

On March 29, 2005, Foust filed an Application for Reopening in the Ohio Supreme Court, pursuant to Ohio Appellate Rule 26(B) and *State v. Murnahan*, 63 Ohio St. 3d 60 (1992), raising the following three propositions of law:

> Proposition of Law No. 1:   The trial court prejudicially erred by weighing all the mitigating factors in Ohio Revised Code 2929.04(B) at the sentencing hearing, despite the fact that appellant did not present evidence on all the factors at the mitigation phase.
>
> Proposition of Law No. 2:   Ohio Revised Code 2949.22(A)(1) mandating lethal injection as the sole means of execution in Ohio, is unconstitutional and violates the United States' obligations under international law.
>
> Proposition of Law No. 3:   Where trial counsel's performance in the trial and mitigation phases of a capital case falls below professional standards of reasonableness, counsel has rendered ineffective assistance, thereby prejudicing the defendant in violation of his constitutional rights.
>
> 1.     Failure to object to admission of, and testimony about, the victim's alleged rape kit without proper foundation being established.
>
> 2.     Failure to obtain and utilize an addiction expert during the mitigation phase.
>
> 3.     Failure to obtain a mitigation specialist.

The Ohio Supreme Court denied Foust's Application to Reopen Direct Appeal on August 10, 2005 (Apx. Vol. 3, p. 211).

## FEDERAL HABEAS CORPUS

On October 30, 2006, Foust filed a Notice of Intent to File a Petition for Writ of Habeas Corpus.  His Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 was filed on March 22, 2007 raising the following ten claims for relief:

> First Ground for Relief:  Ineffective Assistance of Counsel for Neglect in Pretrial Practice and Preparation.

12

Second Ground for Relief: Ineffective Assistance of Counsel for Affirmative Pretrial Actions.

Third Ground for Relief: Ineffective Assistance of Counsel During First Phase of Trial.

Fourth Ground for Relief: Ineffective Assistance of Counsel in Mitigation Phase.

Fifth Ground for Relief: *Brady* Violations.

Sixth Ground for Relief: Defective Indictment; Ineffective Assistance of Counsel for Not Objecting.

Seventh Ground for Relief:  *Miranda* Violations.

Eighth Ground for Relief:  Three-judge Panel Errors in Mitigation Weighing Process.

Ninth Ground for Relief: Cumulative Error.

Tenth Ground for Relief: Ohio Death Penalty Unconstitutional.

## STANDARD OF REVIEW

The  standard  set  forth  in  the  Antiterrorism  and  Effective  Death  Penalty  Act  ("AEDPA")

applies to this Petition.  AEDPA changed federal habeas corpus law in several important respects.

Among the most significant of these changes is the standard of review to be applied to state court

legal and factual determinations. Under the Act:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

13

The Supreme Court, in *Williams v. Taylor*, 529 U.S. 362 (2000), analyzed the standard of review a federal habeas court must apply under § 2254(d).  The Supreme Court provided definitions for the phrases "contrary to," "unreasonable application of," and "clearly established federal law" set forth in § 2254(d)(1).

The Supreme Court first pointed out that the phrases "contrary to" and "unreasonable application of" must be given independent meanings. *Id.* at 404-05. A state court decision can be "contrary to" the Supreme Court's clearly established precedent in two ways: (1) "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law;" and (2) "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to" that decision. *Id.*

The *Williams* Court also stated that the word "contrary" "is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" *Id.*  Thus, § 2254 "suggests that the state court's decision must be substantially different from the relevant precedent of [the Supreme Court]." *Id.*  The Supreme Court suggested this phrase would be applicable if the state court applies a rule that contradicts the governing law set forth in prior Supreme Court cases, such as if a state court were to hold that, in order to establish an ineffective assistance of counsel claim, a defendant must prove by a preponderance of the evidence, instead of only a "reasonable probability," that the results of the trial would have been different.  *Id.* at 405-06.

The Supreme Court held that an "unreasonable application" occurs when "the state identifies the correct legal principle from this Court's decision but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 410, 413 ("For purposes of today's opinion, the most important point is that an *unreasonable* application of federal law is different from an *incorrect* application of

14

federal law.") (emphasis in original); *see also Cone v. Bell*, 492 F.3d 743, 750 (6th Cir. 2007) (holding petitioner must show the state court applied Supreme Court precedent to the facts of his case in an objectively unreasonable manner).

The Supreme Court also pointed out that, to determine the reasonableness of the state court's decision, a court must employ an objective test, not a subjective one.  The *Williams* Court  rejected the Fourth Circuit's holding that a state court's application of federal law was only unreasonable "if the state court has applied federal law in a manner that reasonable jurists would all agree is unreasonable."  *Williams*, 529 U.S. at 376. The Court reasoned this test was too subjective because a court might "rest its determination . . . on the simple fact that at least one of the Nation's jurists has applied the relevant federal law in the same manner the state court did in the habeas petitioner's case." *Id.* at 410.

The *Williams* Court also provided further guidance for the phrase "clearly established holdings of the Supreme Court."  *Id.* at 412.  The Court stated this statutory phrase "refers to the holdings as opposed to its dicta, of this Court's decisions as of the time of the relevant state-court decision." *Id.* The Sixth Circuit has noted "this provision marks 'significant change' and prevents the district court from looking to lower federal court decisions in determining whether the state court decision is contrary to, or an unreasonable application of, clearly established federal law. . . ." *Harris v. Stovall*, 212 F.3d 940, 944 (6th Cir. 2000) (quoting *Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998)).

The *Williams* Court referred to the jurisprudence it has developed under *Teague v. Lane*, 489 U.S. 288 (1989), to help guide federal courts as to what qualifies as "clearly established Federal law." *Williams*, 529 U.S. at 412.  The Court stated "[w]hatever would qualify as an 'old rule' under *Teague* will constitute 'clearly established Federal law, as determined by [this] Court.'"  *Id.* Under *Teague*,

15

"a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government." *Teague*, 489 U.S. at 301. Thus, a case announces a new rule if the result was not predicated on precedent existing at the time the defendant's conviction became final. *Id.* "In determining whether the relief requested would constitute a new rule, the question becomes, 'whether a state court considering [the petitioner's] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule [he] seeks was required by the Constitution.'" *Harris*, 212 F.3d at 944 (quoting *Caspari v. Bohlen*, 510 U.S. 383, 390 (1994)); *Saffle v. Parks*, 494 U.S. 484, 488 (1990).

EXHAUSTION AND PROCEDURAL DEFAULT

A.      **Exhaustion**

A state prisoner must exhaust his state remedies before bringing his claim in a federal habeas corpus proceeding.  28 U.S.C. § 2254(b) & (c); *Rose v. Lundy*, 455 U.S. 509 (1982).  Exhaustion is fulfilled once a state supreme court provides a convicted defendant an opportunity to review his or her claims on the merits.  *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999); *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).  If under state law there remains a remedy that a petitioner has not yet pursued, exhaustion has not occurred and the federal habeas court cannot entertain the merits of the claim. *Rust*, 17 F.3d at 160.

Claims that were never raised at any time during the state court proceedings are both unexhausted and procedurally defaulted because no Ohio court has had an opportunity to decide them. If a habeas petitioner sought to return to state court and attempted to present new claims to the Ohio Supreme Court, that court would find them procedurally barred.  "The Ohio Supreme Court has stated that it will not consider constitutional claims not raised and preserved in the Ohio Court of Appeals."

*Fornash v. Marshall*, 686 F.2d 1179, 1185 n. 7 (6th Cir. 1982) (citing *State v. Phillips*, 27 Ohio St. 2d 294, 302 (1971)).  Thus, Foust's failure to raise a claim to the Ohio Court of Appeals would preclude Ohio Supreme Court review. This preclusion, in turn, would prevent Foust from satisfying the exhaustion requirement as the Ohio Supreme Court has not had a "fair and full opportunity" to review these claims as *Rust* requires.[3]

A petitioner "cannot obtain federal habeas relief under 28 U.S.C. § 2254 unless he has completely exhausted his available state court remedies to the state's highest court." *Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001) (quoting *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001)). Rather than dismiss certain claims the court deems unexhausted, however, a habeas court need not wait for exhaustion if it determines that a return to state court would be futile.  *Lott v. Coyle*, 261 F.3d 594, 608 (6th Cir. 2001).

### B.    Procedural Default

A federal court may not consider "contentions of federal law that are not resolved on the merits in the state proceeding due to petitioner's failure to raise them as required by state procedure." *Wainwright v. Sykes*, 433 U.S. 72  (1977).  If a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.  *Coleman v. Thompson*, 501 U.S. 722, 749-50 (1991).

---

[3]

The Court also notes that the *Perry* rule, discussed *infra*, would bar on grounds of res judicata an Ohio court from considering any issue that could have been, but was not, raised on direct appeal.

As the United States Supreme Court explained, "[t]he procedural default rule is neither a statutory nor a constitutional requirement, but it is a doctrine adhered to by the courts to conserve judicial resources and to respect the law's important interest in the finality of judgments." *Massaro v. United States*, 538 U.S. 500, 504 (2003).

In *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986), the Sixth Circuit set the criteria for determining the defaulted status of a claim: "When a state argues that a habeas claim is precluded by the petitioner's failure to observe a state procedural rule, the federal court must go through a complicated [four-prong] analysis." *Id.* at 138.  Specifically, the Sixth Circuit stated:

> First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule . . . . Second, the court must decide whether the state courts actually enforced the state procedural sanction . . . . Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim. [Fourth, if] the court determines that a state procedural rule was not complied with and that rule was an adequate and independent state ground, then the petitioner must demonstrate . . . that there was "cause" for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

*Id.* (citations omitted).[4]  The claim must be presented to the state courts under the same theory in which it is later presented in federal court.  *Lott*, 261 F.3d at 607, 611, 617, 619; *Wong v. Money,* 142 F.3d 313, 322 (6th Cir. 1998).

---

[4]

In ascertaining whether a state court has addressed the merits of a petitioner's constitutional claim, federal courts must rely on the presumption that there is no independent and adequate state ground for the state court decision absent a clear statement to the contrary.

C.      *Perry* **Res Judicata Doctrine**

Respondent asserts all or part of six claims raised in the Petition are barred from review by this Court because they are procedurally defaulted.  Although the Court finds all or some portion of those claims for relief are procedurally defaulted and should be dismissed, the Court will nonetheless consider the merits of these defaulted claims in an effort to promote judicial efficiency.

Foust argues the rule of res judicata set forth in *State v. Perry*, 10 Ohio St. 2nd 175 (1967), is not an adequate state ground to bar habeas revue.  Under *Perry*, a final judgment of conviction bars a defendant from raising and litigating in any proceeding, except an appeal from that judgment, any defense or any claimed lack of due process that was raised or could have been raised by the defendant at the trial on the merits, or on appeal from that underlying judgment. *Id*. at 180; *see also State v. Roberts*, 1 Ohio St. 3d 36, 39 (1982) (holding policy behind *Perry* bars post-conviction petitioners from raising issues in a collateral proceeding that could have been raised on direct appeal).  Thus, unless a claim is based on evidence outside the record, it must be raised during direct appeal, or be deemed waived.

Foust cites no persuasive authority requiring this Court to find *Perry* unconstitutional. The Sixth Circuit has expressly found the *Perry* rule is an adequate and independent state ground to bar a merit review of a petitioner's claim where such claim is asserted in non-compliance with that rule. *Buell*, 274 F.3d at 349 ("This court has held that [the *Perry* rule] is regularly and consistently applied by Ohio courts as required by the four part *Maupin* test") (citing *Byrd v. Collins*, 209 F.3d 486, 521-22 (6th Cir. 2000)); *see also Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir. 2006) (holding procedural rule of res judicata is an adequate and independent state ground for refusal to hear the claim by the Ohio Supreme Court); *Mapes v. Coyle*, 171 F.3d 408, 420 (6th Cir. 1999) (noting the

19

*Perry* rule has been consistently applied). Consequently, this Court holds any claim the Ohio courts refused to address based on *Perry* is procedurally defaulted and barred from habeas review absent a showing of cause and prejudice.[5]

Ohio has a contemporaneous objection rule under which an appellant who fails to object waives later review of the issue unless plain error can be shown. *Williams v. Bagley*, 380 F.3d 932, 968 (6th Cir. 2004), *cert. denied*, 544 U.S. 1003 (2005) (citing *State v. Smith*, 89 Ohio St. 3d 323, 332 (2000)). The Sixth Circuit has held Ohio's contemporaneous objection rule constitutes an adequate and independent state ground barring federal review absent a showing of cause for the waiver and resulting prejudice. *Id.*; *Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001); *Stojetz v. Ishee*, No. 2:04 CV 263, 2006 WL 328155, at *12 (S.D. Ohio Feb. 10, 2006).

A state court's review of an issue for plain error is considered by the Sixth Circuit as the enforcement of a procedural default. *Williams,* 380 F.3d at 968; *Hinkle*, 271 F.3d at 244. The federal court, in determining whether a state court has relied on a procedural rule to bar review of an issue, examines the latest reasoned opinion of the state courts and presumes that later courts enforced the

---

[5]

The Supreme Court of Ohio recognized an exception to the *Perry* rule in *State v. Hester*, 341 N.E. 2d 304 (Ohio 1976). The *Hester* Court concluded that, where the record does not disclose the issue of competent trial counsel has been adjudicated, res judicata is an improper basis upon which to dismiss an Ohio post-conviction petition. *Id.* at syllabus para. 2. The Ohio Supreme Court subsequently modified the *Hester* exception to the *Perry* rule in *State v. Col*e, 443 N.E.2d 169 (Ohio 1982), finding that:

> Where the defendant, represented by new counsel upon direct appeal fails to raise therein the issue of competent trial counsel, and said issue could fairly have been determined without resort to evidence outside the record, *res judicata* is a proper basis for dismissing defendant's petition for post-conviction relief.

*Id.* at syllabus. These modifications to the *Perry* rule have led federal habeas courts to conclude Ohio's post-conviction statute, upon which *Perry* rests, satisfies due process. *Morales v. Coyle*, 98 F. Supp. 2d 849, 861 (N.D. Ohio 2000).

20

bar instead of rejecting the claim on the merits. *Hinkle*, 271 F.3d at 244 (citing *Ylst*, *v. Nunnemaker*, 501 U.S. 797, 803 (1991)).

Generally, if the district court concludes the state prisoner has procedurally defaulted his federal claims in state court, federal review is barred unless the prisoner can demonstrate "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrates that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 749.

Demonstrating "cause" requires showing that some factor external to the defense impeded counsel's efforts to comply with the state procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Demonstrating "prejudice" requires showing a disadvantage "infecting" the trial with constitutional error. *United States v. Frady*, 456 U.S. 152, 168 (1982).

Absent cause and prejudice, federal courts may not review issues that are procedurally defaulted unless the petitioner shows his conviction is the result of a fundamental miscarriage of justice. A fundamental miscarriage of justice is a conviction of one who is "actually innocent." *See Coleman*, 501 U.S. at 750; *Murray*, 477 U.S. at 496. The Supreme Court requires the petitioner to demonstrate not merely a reasonable doubt in light of new evidence, but rather that "it is more likely than not that no reasonable juror would have convicted in light of the new evidence." *Schlup v. Delo*, 513 U.S. 298, 327 (1995). The petitioner fails to meet his burden if "at least one juror, acting reasonably and properly instructed would have found" him guilty. *Id.* at 329.

### INDIVIDUAL GROUNDS FOR RELIEF

**First, Second, Third, and Fourth Grounds for Relief -- Ineffective Assistance of Counsel**

Foust alleges ineffective assistance of counsel at both the guilt and penalty phases of trial in each of his first four grounds for relief and the Court will address them together.

Counsel's performance during a criminal trial must be sufficient to ensure a defendant's trial was fair. *Strickland v. Washington*, 466 U.S. 668, 685 (1984). To succeed, a habeas petitioner must satisfy the two-prong test for ineffective assistance of counsel set forth in *Strickland*. First, Petitioner must demonstrate counsel's errors were so egregious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Second, Petitioner must show he was prejudiced by counsel's errors. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* Prejudice exists when there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694; *Hicks v. Collins*, 384 F.3d 204, 214 (6th Cir. 2004), *cert. denied*, 544 U.S. 1037 (2005).

To demonstrate ineffective assistance of counsel, Petitioner must point to specific errors in counsel's performance. *United States v. Cronic*, 466 U.S. 648, 666 (1984). This Court must subject the allegations to rigorous scrutiny, determining "whether, in light of all circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. There is a strong presumption that counsel's conduct was reasonable and might be part of a trial strategy. *Id.* at 689. "Judicial scrutiny of a counsel's performance must be highly deferential and . . . 'every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from

22

counsel's perspective at the time.'" *Bell v. Cone,* 535 U.S. 685, 698 (2002) (quoting *Strickland*, 466 U.S. at 689).  To ascertain whether counsel's performance prejudiced a criminal proceeding, this Court does not speculate whether a different strategy might have been more successful, but rather must "focus on the question of whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). "It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.*

### FIRST GROUND FOR RELIEF

In his First Ground for Relief, Foust alleges his counsel was ineffective because they failed to obtain the services of experts (arson investigator, DNA expert, independent forensic pathologist, mitigation specialist, and false confession expert); failed to object to an allegedly defective indictment; and failed to inquire and investigate a potential conflict of one of the judges of the three-judge panel that decided his case.  Respondent concedes Foust presented this claim in the Ohio courts as to the arson investigator, the DNA expert, the mitigation specialist, and the judge's potential conflict. Thus, the claim is preserved for federal habeas relief as to these issues.  Foust has never claimed his counsel was ineffective for failing to hire an independent forensic pathologist or a false confession expert. Since these claims were not submitted to the Ohio courts, they are procedurally defaulted. *See Martin v. Mitchell*, 280 F.3d 594, 603 (6th Cir. 2002) (holding that if a claim presented in the federal court was never actually presented in the state courts, but a state procedural rule

23

prohibits the state court from now considering it, the claim is considered exhausted but is procedurally barred).[6]  Moreover, the Court finds the defaulted sub-claims to be without merit.

### A.    Arson Investigator

The Ohio Supreme Court addressed this issue as follows:

Foust also claims that his counsel provided ineffective assistance by failing to request a defense arson expert to assist them in challenging the state's arson expert.

Lt. Victor Gill, a fire investigator, investigated the cause of the fire at the Coreano home.  He concluded that there were "at least three fires and each [had been] separately and intentionally set."  Investigators located a box of matches and a spent match on the kitchen floor and another spent match on the carpet near the point of origin of the upstairs-bedroom fire.  Moreover, Foust confessed that he had been striking matches and "throwing them down" in the house.

In view of overwhelming evidence that Foust started the fires at the Coreano home, counsel could have determined it unnecessary to hire a defense arson expert to challenge Lt. Gill's findings.  Thus, counsel exercised professional judgment in refraining from requesting a defense arson expert.  *See State v. Hartman,* 93 Ohio St. 3d at 300, 754 N.E.2d 1150. As we have noted, " '[a]ttorneys need not pursue every conceivable avenue; they are entitled to be selective.' "  *State v. Murphy* (2001), 91 Ohio St. 3d 516, 542, 747 N.E.2d 765, quoting *United States v. Davenport* (C.A.7, 1993), 986 F.2d 1047, 1049.

Finally, resolving this issue in Foust's favor would be purely speculative.  Foust does not indicate how the testimony of a defense arson expert would have made any difference in the outcome of the case.

*Foust*, 105 Ohio St. 3d at 155.  The Court finds the decision of the Ohio Supreme Court was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court.  There was overwhelming evidence that Foust started the fire in the Coreano home.  Absence of an arson expert most likely did not effect the outcome of the trial.  Arson was not the most important charge against Foust.  The evidence showed Foust committed the murder

---

[6]

Foust raised his ineffective assistance of counsel claim for failing to object to the alleged defective indictment in the Ohio Supreme Court in Proposition of Law VI.  Thus, it is preserved for federal habeas review.

before the fire was started.  The rape of Coreano's 17-year-old daughter could have been considered

the more serious aggravating factor that the panel likely relied on in making their decision.

### B.     DNA Expert

The Ohio Supreme Court also found meritless Foust's ineffective assistance of counsel claim

for failing to hire a DNA expert as follows:

> Foust claims that he needed a defense DNA expert to challenge DNA testing
> procedures, to demonstrate the unreliability of DNA evidence, and to assist counsel
> in challenging the state's DNA evidence.

> Foust claims that a DNA expert was crucial to his defense because he never admitted
> striking Coreano with a hammer.  Nevertheless, in his confession, Foust admitted
> "pick[ing] up something by the door and hit[ting Coreano] with it."  Moreover, the
> coroner testified that the circular fracture on the top of Coreano's skull was consistent
> with Coreano's having been hit by the round striking face of a hammer.

> As an initial matter, "the failure to call an expert and instead rely on cross-examination
> does not constitute ineffective assistance of counsel."  *State v. Nicholas,* 66 Ohio St.
> 3d at 436, 613 N.E.2d 225, citing *State v. Thompson* (1987), 33 Ohio St. 3d 1, 10-11,
> 514 N.E.2d 407.  Here, the record reveals that trial counsel's decision to rely on cross-
> examination appears to have been a legitimate "tactical decision," particularly since
> the results of defense DNA testing might not have turned out to be favorable to the
> defense.  *See State v. Hartman,* 93 Ohio St. 3d at 299, 754 N.E.2d 1150.

> Moreover, Foust's argument that his counsel needed a DNA expert to adequately
> prepare for trial is purely speculative.  Despite Foust's assertions, the record does not
> establish a deficiency in his counsel's knowledge about DNA terminology and
> procedures.

> For the foregoing reasons, we reject Foust's claim that his counsel were ineffective by
> failing to utilize a DNA expert.

*Foust*, 105 Ohio St. 3d at 153-54.  The Record showed Foust's counsel was sufficient in the cross-

examination of the coroner concerning DNA evidence. The coroner testified Coreano was hit by a

hammer. Foust admitted he hit Coreano with something he picked up. A DNA expert might have

reiterated the same conclusions presented by the coroner.  The Court finds the decision of the Ohio

Supreme Court was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court.

### C.    Independent Forensic Pathologist

Foust's counsel cannot be faulted for failing to call an independent forensic pathologist.  The evidence showed Coreano was killed by a blow to the head with a hammer that was linked to Foust through DNA evidence.  Further, Foust confessed to preforming this act.  He was not prejudiced by counsel's decision not to hire another medical examiner whose testimony was likely to be similar to the State's witness.

### D.    Mitigation Specialist

Foust's counsel did obtain the services of a mitigation specialist who testified during the sentencing phase of his trial. The adequacy of his testimony is raised in Foust's Fourth Ground for Relief.

### E.    False Confession Expert

The Court finds Foust's counsel was not ineffective for failing to obtain the services of a false confession expert.  Counsel is only required to conduct a reasonable investigation.  *Keith v. Mitchell*, 466 F.3d 540, 543 (6th Cir. 2006), *cert. denied*, 127 S. Ct. 1881 (2007) (citing *Strickland*, 466 U.S. at 690-91).  Foust was advised of his *Miranda* rights before confessing. The Court will address this aspect of the First Ground for Relief in its discussion concerning his *Miranda* violation claim raised in the Eighth Ground for Relief.

26

### F.      Failure to Object to Indictment

The underlying claim was raised in Foust's Sixth Ground for Relief.  Failure to succeed on

the underlying claim requires denial of the ineffective assistance of counsel claim based on this issue.

*Adams v. Bradshaw*, 484 F. Supp. 2d 753, 777 (N.D. Ohio 2007) (holding that in order to succeed on

the prejudicial aspect of an ineffective assistance of counsel claim, defendant must show the

underlying claim has merit).  Therefore, the Court will address this sub-claim in Foust's Sixth Ground

for Relief.

### G.      Failure to Challenge the Presence of a Member of the Three-Judge Panel

The Ohio Supreme Court rejected this claim as follows:

Foust claims that his counsel provided ineffective assistance by failing to object to
Judge Glickman's presence on the three-judge panel. Foust also claims counsel
deficiency in their failing to consult with him on the record before informing the court
that the defense had no objection to Judge Glickman's presence.

During pretrial motions, the trial court informed the parties that Judge Glickman had
recently been appointed to the bench after serving as an assistant Cuyahoga County
prosecutor. The trial court stated, "Counsel have advised me that the mere association
with Judge Glickman and his prior experience with the Prosecutor's Office * * *
would not in and of itself be a matter of concern provided that Judge Glickman had
not had any involvement in any prior actions involving Mr. Foust."

After opening statements, Judge Glickman disclosed his former position as an
assistant county prosecutor "assigned to the major trial unit, but at * * * no time * *
* ever assigned any case regarding this particular defendant." Further, Judge
Glickman stated that he could never recall talking with Mr. Del Balso, the prosecutor,
about Foust's case.  In response, Foust's trial counsel stated, "We're satisfied that the
Court has made a complete inquiry into that situation and we have no objection."

After the second witness testified, Judge Glickman reiterated that he did not know
anything about this particular case from his time at the prosecutor's office but felt he
should disclose that he had worked with Dr. Bligh-Glover (the deputy coroner who
testified in this case) in previous cases, that he had helped train several members of
the coroner's DNA lab-although not Ms. Heinig, and that he had worked with
Detectives Cipo and Kovach on a number of homicide cases.  Again, Foust's trial
counsel agreed that there was "no problem."

27

"The prior professional activities of a judge are not grounds for disqualification where the record fails to demonstrate the existence of a relationship or interest that clearly and adversely impacts on a party's ability to obtain a fair and impartial trial." *In re Disqualification of Cross* (1991), 74 Ohio St. 3d 1228, 657 N.E.2d 1338. Because Judge Glickman had no prior involvement with Foust's case as a prosecutor, counsel had no basis for objecting to his presence on the three-judge panel. Thus, counsel cannot be deficient for failing to object to Judge Glickman's presence on the panel or in failing to file an affidavit of disqualification against him. *See* R.C. 2701.03. Moreover, counsel did not need to consult with Foust on the record about not objecting to Judge Glickman.

Based on the foregoing, we overrule proposition V.

*Foust*, 105 Ohio St. 3d at 157-58.  The Court finds the decision of the Ohio Supreme Court was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court.  Although Judge Glickman was formerly employed by the Cuyahoga County prosecutor, he had no other connection with Foust's case. The judge informed the parties several times of his relationship to the prosecutor and several witnesses.  Foust cites no case supporting his contention that a former prosecutor may be biased in a criminal case solely because of his former employment.

### SECOND GROUND FOR RELIEF

In his Second Ground for Relief, Foust asserts his counsel was ineffective in the pretrial stage of his case. He alleges counsel was ineffective because they: (a) requested a mental evaluation; (b) failed to introduce pertinent evidence and argument during the suppression hearing; (c) failed to ensure Foust understood the consequences of his jury waiver; and (d) failed to inquire and investigate the nature and extent of Judge Glickman's conflict.  Respondent agrees that Foust's sub-claim that counsel was ineffective during the suppression hearing was presented to the Ohio Supreme Court and is preserved for federal habeas review but contends the other sub-claims have been defaulted.  The sub-claim that counsel was ineffective because they requested a mental evaluation was never raised

28

in the Ohio courts.  Foust concedes it was not raised on direct appeal and is defaulted.  Counsel raised

ineffective assistance of counsel for failure to ensure Foust understood the consequences of his jury

waiver in the Ohio Supreme Court in Proposition of Law VI.  Thus, it is preserved for federal habeas

review.  Foust raised the failure to inquire and investigate the nature and extent of Judge Glickman's

conflict in post-conviction relief. The court of appeals ruled it was barred by res judicata. The Ohio

Supreme Court's enforcement of a procedural bar is an adequate and independent state ground on

which the state can foreclose federal review.  If the Court were to consider the defaulted sub-claims,

it would find them to be without merit.

### A.  Counsel Was Ineffective Because They Requested a Mental Evaluation

Under Ohio Revised Code § 2929.03(D), a defendant may request a pre-sentence investigation

or mental examination.  If he so requests, the resulting reports must be provided to the court, the jury,

and the prosecutor.  The Supreme Court found this procedure enhances the search for the truth and

does not render the proceedings unfair.  *Williams v. Florida*, 399 U.S. 78, 82 (1970); *Frazier v.*

*Mitchell*, 188 F. Supp. 2d 798, 838 (N.D. Ohio 2001), *rev'd in part on other grounds by Frazier v.*

*Huffman,* 343 F.3d 780 (6th Cir. 2003).   The Sixth Circuit has also rejected this claim without

discussion.  *Cooey v. Coyle,* 289 F.3d 882, 925-26 (6th Cir. 2002).  Foust has not shown how he was

prejudiced by counsel referring him for a mental evaluation.

### B.  Counsel Was Ineffective During the Suppression Hearing

The Ohio Supreme Court rejected this claim stating:

In a pretrial motion, defense counsel filed a motion to suppress Foust's confession "on
the grounds that Defendant did not knowingly, voluntarily, and intelligently waived
[sic] his rights before making such oral statements."  During the presentation of the
state's evidence on the motion, Detective Michael Cipo testified that Foust was
advised of his *Miranda* rights prior to making a statement.  Foust then waived his
*Miranda* rights and agreed to provide a statement.  According to Detective Cipo, Foust

29

did not appear to be under the influence of alcohol or drugs and provided coherent responses to police questioning.  Moreover, Foust never informed the police during the interview that he wanted to talk to a lawyer.

Foust argues that his counsel were deficient in failing to introduce any evidence to support their assertion that he had asked the police to let him speak to an attorney. However, the record supports the voluntary element of Foust's confession.  Thus, it would be highly speculative to conclude that other evidence could have been presented to show that Foust's confession was involuntary or that he had asked for a lawyer.  *See State v. Hartman,* 93 Ohio St. 3d at 299, 754 N.E.2d 1150.  Moreover, Foust's contention of ineffective assistance of counsel in not calling him as a witness to support the motion is not well taken.  Counsel's decision "fell within the realm of trial strategy." *State v. Gross,* 97 Ohio St. 3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, ¶ 121.

Foust also claims that his counsel were deficient by failing to cross-examine Detective Denise Kovach about the voluntariness of Foust's confession.  During the state's case-in-chief, the prosecution introduced Foust's confession through Detective Kovach's testimony.  Detective Kovach, who had not testified at the hearing on the motion to suppress, testified that police had advised Foust of his *Miranda* rights and that he had waived those rights prior to making his confession.  At the conclusion of the state's case, defense counsel renewed the motion to suppress the confession, which the court overruled.

Foust argues that his counsel provided ineffective assistance by failing to ask Detective Kovach during cross-examination whether Foust had requested a lawyer before making his confession.  However, Foust's confession was determined to be admissible evidence before Detective Kovach testified.  Both Detective Cipo's testimony and Foust's written waiver of his *Miranda* rights had earlier established that Foust had waived his right to a lawyer prior to confessing. Given the strong presumption that counsel's performance constituted reasonable assistance, the decision to forgo further cross-examination on this issue represented a valid "tactical decision." *See State v. Thomas,* 97 Ohio St. 3d 309, 2002-Ohio-6624, 779 N.E.2d 1017, ¶ 51; *State v. Hartman,* 93 Ohio St. 3d at 297, 754 N.E.2d 1150.

Finally, it is highly speculative whether further cross-examination of Detective Kovach would have made any difference in the outcome of the reasserted motion to suppress.  Indeed, counsel may have decided to forgo further cross-examination of Detective Kovach to avoid eliciting testimony that might not come out in Foust's favor.  *See State v. Hanna,* 95 Ohio St. 3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 123. Moreover, Foust's counsel had no duty to cross-examine Detective Kovach about the voluntariness of Foust's confession solely because they had reasserted the motion to suppress at the end of the state's case.

*Foust,* 105 Ohio St. 3d at 156-57.

Foust asserts that his *Miranda* rights were defective, the suppression hearing failed to indicate his statements were coerced, he repeatedly requested an attorney, and the statement was inaccurate. More importantly, he contends counsel should have called him to testify.

There was abundant evidence that Foust was advised of his *Miranda* rights and that he waived them.  Defense counsel made a reasonable strategic decision not to put Foust on the stand.  Counsel appear to be second-guessing this strategic choice, which is exactly what *Strickland* prohibits.  The advice to Foust not to testify during the suppression hearing was not clearly erroneous, as Foust suggests. The State could have used any incriminating statements he made. It is too speculative to find he would not have made any incriminating comments in answer to a question by the prosecutor. The Court finds the decision of the Ohio Supreme Court was not contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. The *Miranda* claim was raised in Foust's Seventh Ground for Relief. Therefore, the Court will address this claim below.

### C.     Counsel Failed to Ensure Foust Understood the Consequences of His Jury Waiver

The right to a jury trial is fundamental. *Duncan v. Louisiana*, 391 U.S. 145, 149 (1968).  A criminal defendant may waive a jury trial if: (1) the waiver is in writing; (2) the state's attorney consents to the waiver; (3) the trial court consents to the waiver; and (4) the defendant's waiver is voluntary, knowing and intelligent.  *Spytma v. Howes*, 313 F.3d 363, 370 (6th Cir. 2002) (citing *United States v. Martin*, 704 F.2d 267, 272 (6th Cir. 1983)).  In order for the waiver of a jury trial to be voluntary, knowing and intelligent, the defendant must possess a minimum amount of knowledge concerning this right and the mental capacity to understand the implications of the waiver of the jury

31

trial. *Id.*  A waiver is considered intelligently made if the defendant is aware that a jury is composed of twelve members of the community, that he may participate in the selection of the jury, that the verdict must be unanimous and that the judge alone will decide guilt or innocence if he waives his right to a jury trial.  *Id.*

There is no constitutional requirement that the court conduct a colloquy with the defendant before the waiver can be accepted.  *Sowell v. Bradshaw*, 372 F.3d 821, 832 (6th Cir. 2004), *cert. denied*, 544 U.S. 925 (2005); *Lott,* 261 F.3d at 615.  Failure to conduct an on-the-record colloquy does not constitute reversible error.  *D'Ambrosio v. Bagley,* No. 1:00 CV 2521, 2006 WL 1169926, at *40 (N.D. Ohio Mar. 24, 2006) (citing *United States v. Cochran,* 770 F.2d 850, 853 (9th Cir. 1985)). The burden of demonstrating that a waiver of jury trial was not valid lies with the defendant who waived it.  *Sowell*, 372 F.3d at 832.  This Court must give a high measure of deference to the state court's findings as to the jury waiver.  *Spytma,* 313 F.3d at 371. On habeas review, the finding that the waiver of a jury trial was valid is entitled to a presumption of correctness pursuant to 28 U.S.C. § 2254(3)(1), which can be overcome by clear and convincing evidence.  *Id.*

The Record shows Foust signed a jury waiver and the trial judge conducted the following colloquy:

> THE COURT:  Mr. Foust, this is your signature on this jury waiver; correct?
> THE DEFENDANT:  Yes, sir.
>
> THE COURT:  Okay. Your attorneys have advised you that you have a right to a jury of 12 men and women; correct?
> THE DEFENDANT:  Yes, sir.
>
> THE COURT:  And obviously, then, they have advised you that you can waive that right and have your case tried by three judges instead of a jury. You understand that, sir?
> THE DEFENDANT:  Yes, sir.

32

THE COURT:  Okay. Did anybody put any pressure on you to give up your jury right and have this tried by three judges instead of a jury?
THE DEFENDANT:  No.

THE COURT: Okay. Was this your own free-will decision to do that?
THE DEFENDANT:  Yes.

Tr. Vol. 1, pp. 13-14.

In post-conviction proceedings, Foust stated in an affidavit he had not discussed the possibility of going to trial before a three-judge panel until the day he waived the right to a jury trial (Apx. Vol. 5, pp. 8-10).  He does not specifically state counsel did not explain the consequences of the waiver. He did state he did not want to waive the jury, but felt he had no choice.

The Court finds Foust has not shown by clear and convincing evidence that he did not voluntarily waive a jury trial.  The Record reveals the trial court engaged in a colloquy to determine whether Foust knowingly, intelligently and voluntarily waived this right.  He indicated he understood this right and that he did so voluntarily. His decision appears to be based on a discussion with his counsel who may have believed, based on past experience, that the presiding judge would never impose the death penalty, that there had been a lot of press coverage, and that once the jury saw the pictures of the victim's burnt body, he would be quickly convicted.  The Court finds the decision of the Ohio Supreme Court was not contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court.

**D.      Counsel Failed to Inquire and Investigate the Nature and Extent of Judge Glickman's Conflict**

Judge Stewart Friedman, one of the three-judge panel members, raised this issue at trial stating:

33

Maybe I should put this on the record at this time and we'll go into it again the morning of trial on Wednesday. It has occurred to me that since the defendant has waived a trial by jury and elected to go to a trial to a three judge Court, and one of the judges selected by random draw for that duty is the Honorable Robert Glickman, who recently was appointed to this Court having been an Assistant County Prosecutor until earlier this year, I certainly wanted to be assured that the fact that he was with the Prosecutor's Office in and of itself would not pose a problem and also whether there were any specific facts or involvement that Glickman may have had previously.

Counsel have advised me that the mere association with Judge Glickman and his prior experience with the Prosecutor's Office taking the bench would not in and of itself be a matter of concern provided that Judge Glickman had not had any involvement in any prior actions involving Mr. Foust. That was the basis for Mr. Webster's (defense counsel's) statement just now off the record that that should not be a problem.

I will, of course, raise the question with Judge Glickman in order to make sure that from his perspective as well there are no issues that might cause him to need to recuse himself.

(Tr. Vol. 1, pp. 51-52.)  Counsel obviously knew about Judge Glickman's possible conflict -- that he was a former Cuyahoga County prosecutor and he worked with some of the State's witnesses.  They correctly determined there would be no conflict so long as Judge Glickman had no previous involvement with Foust's case or any other case involving Foust.  Because Foust has not cited any particular facts demonstrating prejudice, the Court finds this sub-claim to be without merit.

### THIRD GROUND FOR RELIEF

The Third Ground for Relief concerns the allegation that defense counsel was ineffective in the guilt phase of Foust's trial.  Specifically, he contends that counsel: (a) failed to investigate and present evidence indicating specific other people were likely in the Coreano residence during the crimes; (b) inadequately prepared and incompetently cross-examined witnesses; (c) failed to object to the State's experts' qualifications and challenge their opinions; and (d) failed to pursue legal issues such as not requesting the merger of the rape and gross sexual imposition charges or constitutionally challenge Ohio Revised Code § 2901.21(C).  Foust raised his contention that counsel failed to

34

investigate and present evidence indicating specific other people were likely in the Coreano residence during the crimes in post-conviction proceedings (Apx. Vol. 5, pp. 198-200; Apx. Vol. 6, pp. 75-76; Apx. Vol. 7, pp. 40-41).  Foust identified Julie Heinig, Joseph Serowik, Demaris Coreano, and Ptl. William Hyland as the witnesses he claims his counsel inadequately prepared and incompetently cross-examined.  Respondent concedes the sub-claim as to those witnesses is preserved for federal habeas review.  However, it is procedurally defaulted as to any other witnesses now brought before the Court.  Foust specifies that counsel failed to object to Julie Heinig's expert qualifications and challenge her opinion. Respondent agrees Foust presented this claim to the Ohio Supreme Court as to Julie Heinig.  Foust asserts his counsel failed to pursue legal issues such as not requesting the merger of the rape and gross sexual imposition charges or constitutionally challenge Ohio Revised Code § 2901.21(C). This claim was presented to the Ohio Supreme Court, and Respondent agrees it is preserved for federal habeas review.

### A.    Counsel Failed to Investigate and Present Evidence Indicating Specific Other People Were Likely in the Coreano Residence During the Crimes

As the trial court found in post-conviction proceedings, police suspected only Foust as the killer from the date of the crime.  Demaris Coreano confidently identified Foust as her attacker, and the State provided overwhelming corroborative evidence to support Foust's conviction.  *State v. Foust*, No. 83771, 2005 WL 2462048, at *7 (83971).  On cross-examination of Demaris Coreano, counsel established she knew a person by the name of Weedo who counsel suggests might have been in the house at the time of the murder.  She was questioned about a statement made during direct examination that she heard coughing in another room while she was tied to the bathtub (Tr. Vol. 1, pp. 180-82).  However, the person who raped her was not in the bathroom when she heard the coughing.  *Id.*  Detective Daniel Kovacic, a fire investigator, testified on cross-examination he

35

interviewed and investigated Weedo, a close friend of Foust, as a possible suspect (Tr. Vol. 2, pp.

330-36).  The questioning shows defense counsel was aware of Weedo as a suspect.  But there was

no evidence Weedo was present in the house at the time of the murder.  Strong evidence pointed only

to Foust as the perpetrator.

## B.      Counsel Inadequately Prepared and Incompetently Cross-examined Witnesses

The Ohio Supreme Court rejected this sub-claim as follows:

Foust also asserts that his counsel provided ineffective assistance by eliciting testimony concerning other acts that Foust had committed.

First, Foust complains that counsel elicited information from Damaris that Foust had been physically violent and that Damaris had seen Foust hit Acevedo.  During cross-examination, defense counsel asked Damaris whether she had told Acevedo that she should stop going out with Foust. Damaris's response, "He was physically violent," was nonresponsive to counsel's question. Counsel then asked, "Did you see any incidence of that?" and Damaris said, "I seen him hit her."
This cross-examination of Damaris was intended to demonstrate bias on the part of Damaris because she had expressed her dislike of him before the night of the murder. It is not ineffective assistance to fail to anticipate a nonresponsive answer to some questions.  Moreover, "this case was tried to a three-judge panel, which was capable of drawing the correct conclusion" from the evidence.  *State v. Frazier* (1991), 61 Ohio St. 3d 247, 254, 574 N.E.2d 483; *accord State v. Post* (1987), 32 Ohio St. 3d 380, 384, 513 N.E.2d 754 (judges presumed to know the law and expected to consider only relevant, material, and competent evidence during deliberations).

Second, Foust complains that his counsel provided ineffective assistance by eliciting from Damaris that her friendship with Acevedo had ended because of Foust's "actions and the things we knew he did." This comment about Foust was a nonresponsive answer to the appropriate question "Where did Janira live at the time that all this came down?" Moreover, Foust did not suffer any prejudice, particularly because a three-judge panel tried the case.  *State v. Frazier,* 61 Ohio St. 3d at 254, 574 N.E.2d 483.

Third, Foust claims that counsel's cross-examination of Damaris improperly elicited Damaris's comment that Foust had mocked her about being a Christian. This response followed a line of questioning about previous discussions Damaris and Foust had had about religion.  We find that counsel's decision to pursue this line of questioning was a legitimate tactical decision, even though some of Damaris's answers resulted in

36

negative information about Foust. *State v. Bradley,* 42 Ohio St. 3d at 144, 538 N.E.2d 373.

Fourth, Foust argues that his counsel provided ineffective assistance by eliciting testimony that Foust had made sexual advances toward Damaris before the night of the rapes. Foust asserts that this testimony supplied a motive for the state's case: revenge of a spurned suitor. However, the record does not support Foust's assertion. During cross-examination, Damaris testified that Foust had expressed some romantic interest toward her but that Foust knew Damaris did not like him and that she had a boyfriend.

Contrary to Foust's claims, Damaris's testimony did not supply a motive for the crimes. By Foust's own admission, he was looking for Acevedo, not Damaris, on the night of the crimes. Thus, the "spurned suitor" motive applied to Foust's relationship with Acevedo, not Damaris. Damaris's testimony does not establish that Foust had a romantic interest in Damaris to support a motive for committing murder. Counsel cannot be considered ineffective for eliciting such testimony.

Fifth, Foust claims that his counsel's cross-examination of Damaris harmed him by eliciting that Foust had "used her to purchase an automobile, to enable [Foust] to drive illegally." During cross-examination, Damaris stated that she had allowed Foust to buy cars and put them in her name because he had told her she would be able to drive them. However, Damaris never got to drive these cars.

Counsel's cross-examination showed that Damaris and Foust knew each other better than she had indicated under direct examination. Moreover, the fact that Damaris was never allowed to drive the cars titled in her name helped establish bias of the witness. Counsel's decision to ask these questions was a reasonable trial strategy and did not constitute ineffective assistance. *State v. Durr* (1991), 58 Ohio St. 3d 86, 96, 568 N.E.2d 674; *State v. Bradley,* 42 Ohio St. 3d at 144, 538 N.E.2d 373.

Sixth, Damaris's comment that she was never told that Foust did not have a license or that it might have been suspended was a nonresponsive comment to one of counsel's questions. Again, this case was presented to a three-judge panel, capable of disregarding nonresponsive comments from the witness. *State v. Post,* 32 Ohio St. 3d at 384, 513 N.E.2d 754.

Finally, Foust claims that counsel's cross-examination of Patrolman William Hyland was ineffective in that it elicited that Foust had once forced Damaris to drink an alcoholic beverage that he often drank and that she had recognized the smell of that beverage on his breath while he raped her. Such testimony was not prejudicial because this case was tried before a three-judge panel. *Id.*

*Foust,* 105 Ohio St. 3d at 158-60.

Usually, decisions concerning whether to conduct cross-examination and, if so, how and to what extent, are matters of trial strategy and generally will not support an ineffective assistance of counsel claim.  *Davie v. Mitchell,* 291 F. Supp. 2d 573, 604 (N. D. Ohio 2003) (citing *Dunham v. Travis,* 313 F.3d 724, 732 (2d Cir.2002)).  *See United States v. Steele,* 727 F.2d 580, 591 (6th Cir. 1984) (Cross-examination falls "within the area of trial tactics and strategy that should not be subjected to second guessing and hindsight by this Court.  An attorney must be free to determine questions of trial strategy.").  The evidence against Foust was overwhelming -- the rape victim identified him as her assailant, his DNA evidence was found on the murder weapon and his thumb print was found on a pipe in the basement.  Further, the case was tried by a three-judge panel that would not be influenced by non-responsive comments from a witness.

### C.     Counsel Failed to Object to the State's Experts' Qualifications and Challenge Their Opinions

This sub-claim was raised and rejected in the Ohio Supreme Court:

**1.   Failure to challenge Heinig's expert qualifications.**  Foust argues that his counsel provided ineffective assistance by failing to object to Julie Heinig's testifying as a DNA expert.   Heinig, a forensic DNA analyst with the Cuyahoga Count Coroner's Office, conducted DNA analysis of blood found on the suspected murder weapon, the hammer found underneath Damaris's bed.  Heinig testified that DNA from the blood matched the DNA of Jose Coreano. She also testified that a DNA analysis of a swab used to collect matter from the hammer's handle showed a "mixture" of DNA from more than one person and that Foust's DNA profile was "visible" within this mixture.

Evid.R. 702(B) provides that a witness may qualify as an expert by reason of his or her "specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony."  Neither special education nor certification is necessary to confer expert status upon a witness. "The individual offered as an expert need not have complete knowledge of the field in question, as long as the knowledge he or she possesses will aid the trier of fact in performing its fact-finding function." *State v. Hartman* (2001), 93 Ohio St. 3d 274, 285, 754 N.E.2d 1150; *State v. Baston* (1999), 85 Ohio St. 3d 418, 423, 709 N.E.2d 128.

38

Contrary to Foust's assertions, Heinig qualified to testify as an expert in DNA analysis. She holds a bachelor of science degree in biology, a master's degree in zoology, and a Ph.D. degree in anatomy and cell biology. Heinig also received six months of training on various testing procedures involving DNA analysis and has testified as a DNA expert on other occasions. *See State v. Bryan,* 101 Ohio St. 3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 32 (Heinig testified that the defendant's DNA was found in the getaway vehicle); *State v. Fluellen,* Cuyahoga App. No. 78532, 2002-Ohio-3262, 2002 WL 1397128, ¶ 14 (Heinig found "well-qualified to serve as an expert in the area of forensic DNA analysis"). Thus, Heinig possessed the necessary qualifications to provide expert testimony at Foust's trial.

Given the strong presumption that counsel's performance constituted reasonable assistance, we find that his defense counsel were not ineffective for failing to challenge Heinig's qualifications as an expert witness. *See State v. Thomas,* 97 Ohio St. 3d 309, 2002-Ohio-6624, 779 N.E.2d 1017, ¶ 51; *State v. Hartman,* 93 Ohio St. 3d at 297, 754 N.E.2d 1150.

**2. Failure to object to Heinig's testimony.** Foust contends that his counsel provided ineffective assistance by failing to object to Heinig's testimony because she allegedly did not adequately establish the scientific method used to conduct DNA testing of the hammer. Heinig testified that DNA material from the hammer was tested using the Short Tandem Repeat ("STR") method. Heinig explained that the STR method examines "13 different regions of DNA" to obtain a person's DNA profile. Using the STR method, Heinig found that "each of the 13 loci" from Foust's DNA was visible in the mixture on the hammer.

Thus, contrary to Foust's claims, Heinig explained the scientific method used in conducting DNA analysis in this case. Moreover, we recognized in *State v. Pierce* (1992), 64 Ohio St. 3d 490, 497, 597 N.E.2d 107, that "the theory and procedures used in DNA typing are generally accepted within the scientific community." Accordingly, "the failure to challenge the admissibility of such evidence cannot be considered ineffective assistance of counsel." *State v. Nicholas* (1993), 66 Ohio St. 3d 431, 437, 613 N.E.2d 225.

Foust also claims that his counsel provided ineffective assistance by failing to object to Heinig's testimony because she did not actually perform the DNA testing herself. During her direct examination, Heinig said, "For the most part another analyst did the testing and I did the DNA typing at the end of the analysis."

The defense counsel's failure to object to Heinig's testimony as hearsay was a tactical decision. By not objecting to Heinig's testimony, the defense counsel avoided forcing the prosecution to call the other DNA analyst as a witness. The other DNA analyst would likely have elaborated upon Heinig's findings and bolstered the prosecution's

case.  Thus, we find that counsel's failure to object to Heinig's testimony did not constitute ineffective assistance.  *See State v. Bradley,* 42 Ohio St. 3d at 144, 538 N.E.2d 373; cf. *State v. Thomas,* 97 Ohio St. 3d 309, 2002-Ohio-6624, 779 N.E.2d 1017, at ¶ 51.

Finally, Foust argues that his counsel provided ineffective assistance by failing to challenge the foundation for Heinig's testimony on the statistical probability that the DNA profile of the blood that matched Jose Coreano's DNA profile would match another person's DNA profile.  Heinig testified that the probability that another person's DNA profile would match the DNA profile obtained from the blood on the hammer was one in 140 trillion for southwestern Hispanics, one in 980 trillion for southeastern Hispanics, and one in four quadrillion for Caucasians.

DNA evidence expressed in terms of population frequency is admissible if it is relevant.  Questions regarding the reliability of DNA evidence in a given case, including DNA statistics on population frequency, go to the weight of the evidence rather than its admissibility.  *See State v. Pierce,* 64 Ohio St. 3d 490, 597 N.E.2d 107, paragraph two of the syllabus.  Moreover, expert witnesses are allowed to testify to statistical conclusions about DNA evidence without being experts in statistical analysis.  *See State v. Rowe* (Dec. 26, 2001), Hamilton App. No. C-000727, 2001 WL 1887770; *State v. Martin* (Aug. 14, 2000), Brown App. No. CA99-09-026, 2000 WL 1145465.  Thus, we find that the defense counsel were not ineffective for failing to object to Heinig's testimony about DNA frequency statistics.

**3.  Adequacy of cross-examination of Heinig.**  Foust asserts ineffective assistance of counsel in their cross-examining of Heinig on her DNA findings.

This court has recognized that " '[t]rial counsel need not cross-examine every witness * * *.  The strategic decision not to cross-examine witnesses is firmly committed to trial counsel's judgment.' "  *State v. Campbell* (2000), 90 Ohio St. 3d 320, 339, 738 N.E.2d 1178, quoting *State v. Otte* (1996), 74 Ohio St. 3d 555, 565, 660 N.E.2d 711.

Foust claims that counsel did not properly prepare to cross-examine Heinig because they did not understand DNA terminology.  According to Foust, counsel's inadequacy is exemplified by the following cross-examination question: "Is it possible that at that first stage of his alleles, whatever you're calling it, someone could have a 17, too?"

Foust's claim that his counsel did not understand DNA terminology and rendered ineffective assistance in cross-examining Heinig about her findings is purely speculative.  Given the "strong presumption" that counsel's performance constituted reasonable assistance, we reject this allegation.  *State v. Bradley,* 42 Ohio St. 3d at 144, 538 N.E.2d 373.

> Foust also fails to explain how further cross-examination of Heinig would have made
> a difference in his case.  If challenged, Heinig would have likely elaborated on the
> reliability of DNA-testing procedures and clarified her testimony.  However, such
> clarification may not have worked in Foust's favor.  Thus, counsel may have decided
> to forgo further cross-examination to avoid the danger of reiterating the state's
> evidence and clarifying expert testimony that might not come out in Foust's favor.
> We find that counsel made a legitimate "tactical decision" and were not ineffective.
> *See State v. Hanna,* 95 Ohio St. 3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 121-123.

*Foust*, 105 Ohio St. 3d at 150-153.

The Ohio Supreme Court found Heinig was qualified to testify as an expert in DNA analysis. She has a bachelor of science degree in biology, a master's degree in zoology, and a Ph. D in anatomy and cell biology.  She also received six months of training on the various testing procedures involving DNA analysis and, as noted by the Ohio court, testified as a DNA expert in other cases.  Challenging her qualification to testify as an expert would have been futile.

Foust asserts counsel should have objected when Heining testified she did not actually perform the DNA testing herself.  However, if there had been an objection, the prosecutor would have called the DNA analyst whose testimony would have been more detailed, thereby bolstering the State's case.  Defense counsel's failure to object can be considered a reasonable tactical decision.

Foust contends defense counsel should have challenged Heinig's conclusion that blood on the murder weapon handle matched Foust's DNA.  Under Ohio law, reliability of DNA evidence and the statistics on population frequency go to the weight of the evidence.  *State v. Pierce,* 64 Ohio St. 3d 490 (1992). The Ohio Supreme Court also found a witness can testify to statistical conclusions about DNA evidence without being an expert in statistical analysis.  *Foust*, 105 Ohio St. 3d a 152.

Foust claims defense counsel was not prepared to cross-examine Heinig because he did not understand the terminology. Only one example of ineptitude in this regard is given. Therefore, the

Court agrees with the Ohio Supreme Court's determination that Foust's contention that counsel did not understand DNA terminology is speculative.

> **D.      Counsel Failed to Pursue Legal Issues Such as not Requesting the Merger of the Rape and Gross Sexual Imposition Charges or Constitutionally Challenge Ohio Revised Code § 2901.21(C)**

Since gross sexual imposition is a lesser-included offense of rape, a defendant may not be convicted of both crimes when they arise out of the same conduct. *State v. Johnson*, 36 Ohio St. 3d 224 (1988). In determining whether offenses are allied and of similar import, the Court must first determine whether the elements of the two crimes are similar to such a degree that commission of one offense results in the commission of the other. *State v. Rance*, 85 Ohio St. 3d 632, 636 (1999); *State v. Gest*, 108 Ohio App. 3d 248, 262 (Ohio Ct. App. 1995).  If the elements are similar, the offenses are allied.  Once it is determined the offenses are allied, the trial court must then decide whether the offenses were committed separately or with a separate animus in order to sustain a conviction for both offenses.  *Id.  See State v. Nievas,* 121 Ohio App. 3d 451, 457-58 (Ohio Ct. App. 1997).  The Ohio Supreme Court stated:

> One of the three counts of gross sexual imposition that Foust was found guilty of committing was based upon evidence that Foust touched Damaris's vagina with his knife.  Damaris testified that Foust left the bathroom after he tied her to the leg of the bathtub.  However, he returned to the bathroom after hearing Damaris move around.  According to Damaris, Foust cut off one of her braids, touched her vagina with a knife, and threatened to slice her open if she moved.  This constitutes conduct separate and distinct from rape.  Under these facts, the crimes of gross sexual imposition differ from rape, and, therefore, Foust could be convicted of each.

*Foust*, 105 Ohio St. 3d at 161-62. The Court agrees with the Ohio Supreme Court's decision on this issue.

Counsel was not ineffective for failing to raise a voluntary intoxication defense.  Ohio Revised Code § 2901.21(C) provides:

> Voluntary intoxication may not be taken into consideration in determining the existence of a mental state that is an element of a criminal offense. Voluntary intoxication does not relieve a person of a duty to act if failure to act constitutes a criminal offense. Evidence that a person was voluntarily intoxicated may be admissible to show whether or not the person was physically capable of performing the act with which the person is charged.

In *Montana v. Egelhoff*, 518 U.S. 37, 56 (1996), the United States Supreme Court held a criminal defendant is not constitutionally entitled to a voluntary intoxication defense. *See Smith v. Bradshaw,* No. 1:04 CV 694, 2007 WL 2840379, *11 (N. D. Ohio Sept. 27, 2007). Furthermore, since there is no Supreme Court precedent holding the Constitution requires trial courts to give jury instructions on intoxication as a defense to a murder charge, a petitioner is not entitled to habeas relief because of a trial court's failure to provide an intoxication instruction. *Hill v. Mitchell,* 400 F.3d 308, 322 (6th Cir. 2005), *cert. denied*, 546 U.S. 1039 (2005). Therefore, defense counsel was not ineffective for failing to challenge the constitutionality of Ohio Revised Code § 2901.21(C).

The Court finds the decisions of the Ohio courts on these sub-claims were not contrary to, or an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court.

### FOURTH GROUND FOR RELIEF

In his Fourth Ground for Relief, Foust contends his counsel was ineffective in preparation for the mitigation phase of the trial. Specifically, he alleges: (a) trial counsel affirmatively refused to object to the improper introduction of all trial phase exhibits at the mitigation phase; and (b) trial counsel provided ineffective assistance by failing to obtain the assistance of a mitigation expert/investigator, by not timely telling the person who was improperly designated as a mitigation "expert" that he should conduct the mitigation investigation, by not attempting to obtain their client's

43

life history, by failing to interview mitigation witnesses or the mitigation "expert," and by failing to obtain an expert in substance abuse.

Respondent agrees sub-claim (a) was raised on direct appeal to the Ohio Supreme Court and is preserved for federal habeas review.  In post-conviction proceedings, Foust claimed his counsel was ineffective for failing to obtain and utilize a trained mitigation specialist. Thus, the mitigation aspect of the second sub-claim is preserved for federal habeas review. Failure to obtain a substance abuse expert was brought before the Ohio Supreme Court and is also preserved for federal habeas review. Foust concedes the claims concerning counsel's delay in asking for funds and waiting too long to tell Dr. Karpawich he was supposed to conduct the mitigation investigation are defaulted. If the Court were to consider the defaulted portion of the second sub-claim, it would find it to be without merit.

**A.      Trial Counsel Affirmatively Refused to Object to the Improper Introduction of All Trial Phase Exhibits at the Mitigation Phase**

Errors involving state evidentiary matters, especially rulings regarding the admission or exclusion of evidence, usually are not reviewable in federal habeas corpus actions. *Estelle v. McGuire*, 502 U.S. 62, 67 (1991). In *State v. DePew*, 38 Ohio St. 3d 275, 282 (1988), photos and exhibits relevant to the specific aggravating circumstance were allowed to be introduced in the penalty phase. The Ohio Supreme Court stated in *DePew*, 38 Ohio St. 3d at 282-83:

> We now hold that, pursuant to R.C. 2929.03(D)(1), the prosecutor, at the penalty stage of a capital proceeding, may introduce ". . . any evidence raised at trial that is relevant to the aggravating circumstances the offender was found guilty of committing . . . ." While this appears to permit repetition of much or all that occurred during the guilt stage, nevertheless, a literal reading of the statute given to us by the General Assembly mandates such a result, especially in light of the prosecution's obligation to demonstrate, by proof beyond a reasonable doubt, that the aggravating circumstances the defendant was found guilty of committing are sufficient to outweigh the factors in mitigation.  R.C. 2929.03(D)(1).

44

The *DePew* court recognized that allowing evidence relevant to the specific aggravating circumstance the defendant was found guilty of in the guilt phase of the trial could mean allowing the admission of all evidence presented at the guilt phase.  Two district courts have found any possible error in readmitting trial phase evidence in the penalty phase, assuming it is error, was insufficient to warrant habeas corpus relief.  *Davis v. Mitchell,* 110 F. Supp. 2d 607, 626 (N.D. Ohio 2000), *rev'd on other grounds*, 318 F.3d 682 (6th Cir. 2003) (finding no violation of clearly established federal law in the trial court readmitting in the penalty phase all evidence from the trial phase); *Morales v. Coyle,* 98 F. Supp. 2d 849, 885 (N.D.Ohio 2000) (holding that any possible violation of state law in admitting into evidence at the penalty phase all exhibits from the trial phase was insufficient to warrant habeas corpus relief).  In *Jackson v. Bradshaw*, No. 2:03 CV 983, 2007 WL 2890388, at **69-69 (S.D. Ohio Sep. 28, 2007), the court held there was no prejudice by counsel's failure to object to the reintroduction of all the culpability evidence in the mitigation phase of the trial.  The Court finds, as to this sub-claim, the decision of the Ohio Supreme Court was not contrary to, or an unreasonable application of, clearly established federal law as determined by the United States Supreme Court.

**B.      Trial Counsel Provided Ineffective Assistance by Failing to Properly Prepare Expert Mitigation Testimony**

Foust asserts his counsel failed to prepare for mitigation in the following manner.  First, they waited months after their appointment as defense counsel to request approval of a mitigation expert. When approval was granted, they allegedly did not obtain a person trained and qualified as a mitigation specialist. Second, Foust contends they failed to inform the mitigation expert, Dr. Karpawich, of his continued role in the case until the start of the trial.  Third, despite reminders of their obligation by Dr. Karpawich, they did not obtain the services of a mitigation investigator, allegedly confusing his status as a mental health professional with that of a mitigation specialist.

45

Fourth, they allegedly made no effort to obtain essential records nor did they contact any witnesses. Finally, they allegedly ignored Dr. Karpawich's repeated requests to meet to plan and discuss mitigation strategy.

Furthermore, defense counsel allegedly ignored Foust's seven siblings, four of whom indicated they were willing to testify on his behalf.  Had they testified, the court would have allegedly heard compelling and detailed first-hand testimony of the horrific circumstances of Foust's upbringing and the constant and severe physical abuse from his father as well as witnessing their father stabbing the family dog to death.

Also, numerous records from Social Services were allegedly not considered by the court. Foust asserts that trained mitigation specialist Dorian Hall explained these records would have "elucidated the testimony of both of Foust's parents and enhanced Dr. Karpawich's testimony as well as to vividly portray the chaotic and dysfunctional life Mr. Foust experienced" (Apx. Vol. 4, p. 281).

Defense counsel has a constitutional duty to investigate a defendant's background when preparing for the penalty phase of the trial.  *Harries v. Bell*, 417 F.3d 631, 637 (6th Cir. 2005).  In *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) the Supreme Court held *Strickland* does not require defense counsel to investigate and present every possible type of mitigating evidence no matter how unlikely it would assist the defendant.  A strategic decision to forego certain mitigation evidence is reasonable to the extent that "reasonable professional judgments support the limitation on investigation" *Id*. (quoting *Strickland,* 466 U.S. at 690-91).

The Supreme Court, in *Rompilla v. Beard*, 545 U.S. 374, 387 n. 7 (2005) and *Wiggins,* 539 U.S. at 524, has held a thorough and complete mitigation investigation is absolutely necessary in capital cases.  The Sixth Circuit uses the ABA Guidelines adopted in 2003.  *Dickerson v. Bagley*, 453

46

F.3d 690, 694 (6th Cir. 2006) (citing *Hamblin v. Mitchell*, 354 F.3d 482, 485-88 (6th Cir. 2003)). The ABA Guidelines provide that penalty phase preparation requires extensive investigation into personal and family history, anything in the life of the defendant which might mitigate against the appropriateness of the death penalty.  Counsel should begin the investigation the moment of conception and should include medical history, family and social history, educational history and employment and training history.  According to the ABA Guidelines, it is necessary to locate and interview the defendant's family members and virtually anyone else who knew the defendant and his family, including neighbors, teachers, clergy, case workers, doctors, correctional, probation, or parole officers and others.  Records from government agencies, the military, and employers also should be requested.  ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases ¶ 10.7 (2003), pp. 80-83.  A partial, but incomplete mitigation investigation does not satisfy the requirements of *Strickland*.  *Dickerson,* 453 F.3d at 694.  A strategic decision not to perform a complete investigation is inadequate when a full investigation would have revealed extensive mitigation evidence.  *Id*. at 696.  An investigation must be performed if the investigator does not know the relevant facts that the investigation would uncover. *Id.*

> The Ohio Court of Appeals addressed this issue during the post-conviction proceedings:
>
> A review of the evidence attached by Foust in support of his claim of ineffective assistance of counsel reveals that Foust has failed to demonstrate that counsel breached an essential duty owed to him. With respect to Foust's arguments that his attorneys were ineffective during the mitigation phase of the trial, we note that during that phase of trial, Foust presented testimony from Gary William Foust, Sr. (Foust's father), Barbara Ann Foust (Foust's mother), and Dr. James Karpawich (mitigation specialist and defense psychologist).  The testimony portrayed the abusive and dysfunctional home life of Foust, the history of abuse by Foust's father, and Foust's alcohol dependency.  Therefore, the record shows that Foust's counsel presented a competent and meaningful theory of mitigation.

47

In support of these claims for relief, Foust submitted affidavits of family members, records from Cuyahoga County Children's Services, and the Ohio Department of Youth Services, all of which reiterate what a dismal home life Foust endured as a child. The trial court found that the decision of Foust's counsel to not place this additional evidence on the record was a tactical decision designed to avoid cumulative testimony, which had no bearing on the outcome of trial. We cannot say that the trial court abused its discretion in making these findings.

*Foust,* 2005 WL 2462048 at *9.

Review of the Record shows defense counsel did not violate *Strickland.* Foust's father, mother and Dr. Karpawich testified at the mitigation hearing. His father testified he had a drinking problem and was abusive towards his wife in front of the children (Tr. Vol. 2, pp, 506-07). There were times when he drank and stayed away from home. *Id.* at 506. The children were terrified of him. *Id*. at 519.

Foust's mother testified her husband "was always – if he wasn't hitting, he was screaming, he was threatening, he was ridiculing, berating them . . ." *Id.* at 528. When Foust was young, he was an excellent student. *Id*. at 531. Then he became influenced by his criminal, older brother who was later murdered during a drug bust. *Id.* at 532-33, 516. All of her eight children were placed in foster homes after the accidental death of a daughter. *Id.* at 543.

Dr. Karpawich testified he was a clinical psychologist who consults mostly on forensic matters at forensic centers or court clinics as well as community health centers. *Id.* at 549. He contacted Foust's father, mother and one of his sisters and interviewed Foust. *Id.* at 553. Dr. Karpawich acknowledged Foust's traumatic upbringing, including his father's physical abuse toward all of the family and the fact that his mother was unstable. *Id.* at 555. He also stated Foust suffered from a major depression disorder for several months prior to the offense which would have caused him to act inappropriately or impulsively. *Id.* at 557, 561. Also, Dr. Karpawich stated Foust suffered from severe alcohol abuse, so severe that he consulted with another doctor about it. *Id.* at 567.

48

The Court finds the trial court had sufficient evidence of Foust's background, including his dysfunctional family and history of abuse by his father. He was not prejudiced by the use of Dr. Karpawich as a mitigation specialist.  It appears exhibits from Social Services were presented to the court during post-conviction proceedings. The trial court stated in its opinion:

> Despite petitioner's protestations, the record of his trial is replete with evidence, acknowledged by the (Trial) Court in is (Sentencing) Opinion, as to Kelly Foust's history of abuse and neglect, growing up in a "family that can only be described as dysfunctional and marked by an alcoholic father." Considered in this context, the decision not to call additional witnesses evidently was a tactical one, in order to avoid cumulative testimony as to matters already sufficiently before the Court. Thus, counsel's decision was a tactical one which had no material bearing upon the outcome of the trial, and accordingly cannot even be faulted in retrospect.
>
> Counsel notes, for example, that: "A mitigation expert would have collected at least the Cuyahoga County Children's Services records and alerted defense counsel to their value as mitigation."  Other records are referenced in the affidavit of Dorian Hall, a "mitigation specialist" in the office of the Ohio Public Defender (Ex. 11). That affidavit paints a truly grisly picture of the Foust home; however, it is a picture already painted vividly by the testimony that was received at trial.  It must be noted that, even without the records mentioned by Ms. Hall, this Court had before it ample documentation of the defendant's background, including his dysfunctional family and significant history of abuse by his father. Given the full and rounded picture of the defendant presented at trial, the Court can conclude only that such records would have been cumulative in establishing any mitigating factors. Once again, the petitioner has failed to establish that this constituted ineffective assistance of counsel or that his defense was compromised by the performance of his counsel.

(Apx. Vol. 5, pp. 358-59.)

> The Court once again has reviewed the record, and must conclude that each of the grounds cited as potential mitigating factors was adequately explored by the witnesses – both family and expert – who were called to testify.  Even assuming, arguendo, that counsel is correct that greater effort could have been made to prepare the mitigation witnesses who testified, the record is clear that the evidence presented in support of mitigation was more than adequate to enable the Court to understand the emotional factors in petitioner's life that were raised at trial.  Moreover, the Court already has noted that it was fully apprised of those elements of the petitioner's background that were asserted as mitigating factors.  It was rather the inhuman and gratuitous brutality of petitioner's conduct – not any lack of evidence as to his psyche – that was overwhelming in compelling all three judges to reach the decision they reached both independently and unanimously.

(Apx. Vol. 5, p. 359.)  The Court finds the decision of the Ohio court was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court.

Foust also contends his counsel should have hired a substance abuse expert.  The Ohio Supreme Court addressed this issue, ruling as follows:

> We reject Foust's claim that counsel's failure to call a substance-abuse expert deprived him of mitigating evidence.  Dr. James Karpawich, a clinical psychologist, testified as a mitigation witness, and the defense introduced his written evaluation into evidence.  Dr. Karpawich testified that Foust was diagnosed with "alcohol dependence."  In his written evaluation, Dr. Karpawich's reviewed Foust's history of alcohol and marijuana abuse and mentioned that Foust reported "abusing alcohol heavily around the time of the present offenses."  Thus, the defense presented "alternative devices that * * * fulfill[ed] the same functions as the expert assistance sought." *State v. Jenkins* (1984), 15 Ohio St. 3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph four of the syllabus; *State v. Nields* (2001), 93 Ohio St. 3d 6, 12-13, 752 N.E.2d 859.

*Foust*, 105 Ohio St. 3d at 154-55.

Dr. Karpawich testified Foust's alcohol abuse was severe, and he was dependent on alcohol (Tr. Vol. 2, pp. 567-68).  He described the interaction between alcohol dependence and depression (Tr. Vol. 2, p. 558).  Dr. Karpawich gave an adequate description of Foust's substance abuse.  There is no indication the outcome of the trial would have been different if a substance abuse expert had testified before a three-judge panel.  The Court finds the decision of the Ohio court was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court.

### FIFTH GROUND FOR RELIEF

Foust alleges in his Fifth Ground for Relief he was deprived of his constitutional rights when records of the police and fire departments which identified additional suspects and provided material for impeachment of State witnesses were not disclosed by the State.  This claim was presented to the Ohio courts during post-conviction proceedings.  Thus, it is preserved for federal habeas review.

Foust presents the following specific examples:

> For instance, police reports indicate that Jose Santiago a/k/a "Weedo" was alleged to have been present in the Coreano household at the time of the offense (Apx. Vol. 4, pgs. 63, 65, 66).  In addition, Charlie Sorrell was questioned regarding involvement in the case.  Police reports reference someone asking whether Sorrell went "in the house with them" (Apx. Vol. 4, pg. 73).  Further, other police reports indicate Santiago attempted to establish an alibi with his girlfriend; however, the reports also detail suspicious inconsistencies and denials in the attempt to establish such an alibi (Apx. Vol 4, pgs. 65, 72, 77).

(Traverse, p. 58.)

A prosecutor is required to turn over material that is both favorable to the defendant and material to guilt or punishment.  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  The prosecutor's duty to disclose includes impeachment evidence, exculpatory evidence, and evidence known only to police investigators.  *Strickler v. Greene*, 527 U.S. 263, 280-81 (1999).  Materiality is relevant to the issue of guilt or innocence and not to the defendant's ability to prepare for trial.  *United States v. Bencs*, 28 F.3d 555, 560-61 (6th Cir. 1994).  In order to prove a *Brady* violation, Petitioner must show: (1) the evidence in question was favorable to the defendant; (2) the evidence was suppressed by the state; and (3) the defendant was prejudiced by the suppression.  *Strickler,* 527 U.S. at 281-82.

*In Kyles v. Whitley*, 514 U.S. 419 (1995), the Supreme Court emphasized the following four aspects of materiality.  First,

51

> . . . a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal. . . The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

*Id.* at 434.  Second, materiality is not a sufficiency of the evidence test.  Even if the evidence, including the suppressed exculpatory evidence, is sufficient to support a conviction, a *Brady* claim may still be successful.  *Id.* at 435.  A *Brady* violation is proven "by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  *Id*.  Third, once a *Brady* violation is found, there is no need for further harmless-error review.  *Id*.  Fourth, when materiality is assessed, the court must look at the suppressed evidence collectively, not item by item.  *Kyles,* 514 U.S. at 436.

> The Ohio Court of Appeals resolved this claim as follows:

> In his first, seventh, and ninth grounds for relief, Foust alleges that the prosecution withheld material evidence depriving him of his rights to due process, fair trial, and effective assistance of counsel.  The evidence relating to Foust's first and seventh grounds for relief consisted of portions of the records of the Cleveland Police and Fire Departments.  Evidence relating to Foust's ninth ground for relief consisted of statements made by Damaris Coreano after Foust's trial.

> The State must provide to a defendant any evidence it has which is favorable to the defendant and is material to either his guilt or punishment.  *Brady v. Maryland* (1963), 373 U.S. 83, 83 S. Ct. 1194, 10 L.Ed.2d 215.  "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine the * * * outcome." *State v. Waddy* (1992), 63 Ohio St. 3d 424, 588 N.E.2d 819, quoting *United States v. Bagley* (1985), 473 U.S. 667, 682, 105 S. Ct. 3375, 3383, 87 L.Ed.2d 481.

> The trial court found that there was no proof to suggest that the evidence had been intentionally withheld by the prosecutors, and, that even if the evidence had been disclosed, it was not material and would not have had an impact on the outcome of the trial.  The trial court found that nothing in the reports detracted from the fact that police suspected only Foust as the assailant from the date of the crime, that Damaris Coreano confidently identified Foust as her attacker, and that the State provided

> overwhelming corroborative evidence to support Foust's conviction. Accordingly, we cannot say that the trial court abused its discretion in finding that the evidence would not have had an impact on the outcome of trial and that therefore the evidence was immaterial.

*Foust*, 2005 WL 2462048 at *7.

The Court finds the decision of the Ohio court was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. Any evidence of another person present in the home where the murder took place is not material because such evidence could not reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. Demaris Coreano knew Foust and positively identified him as her assailant. She was not aware of any other intruders in the house. Further, the full Record, Foust's confession, and physical evidence show police correctly suspected only Foust. Foust would have known if he had an accomplice, and could have informed his counsel who then could have taken appropriate action.

### SIXTH GROUND FOR RELIEF

In his Sixth Ground for Relief, Foust asserts his convictions and sentence are void because the indictment failed to set forth each and every element of the felony-murder enhancement in the five charges of aggravated murder and the death penalty specifications. In addition, trial counsel was allegedly ineffective in failing to object to the defects in the indictment. Although Foust raised this claim in the Ohio Supreme Court, the court held it was waived because counsel did not object at trial. The court reviewed it for plain error and found none. Ohio's contemporaneous objection rule and review under a plain-error standard constitute adequate and independent state grounds barring federal review absent a showing of cause for the waiver and resulting prejudice. Foust argues that because appellate counsel raised ineffective assistance of counsel, the underlying issue of the validity of the

53

indictment is preserved for review by the federal court.  A claim must be presented to the state courts under the same theory in which it is later presented in federal court. *Lott*, 261 F.3d at 607, 611, 617, 619 (citing *Wainwright*, 433 U.S. at 87); *Wong,* 142 F.3d at 322.  Even though the underlying claim is defaulted, it must be addressed because the ineffective assistance of counsel theory was not.

An indictment must state the elements of the offense along with "a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged." *Hamling v. United States,* 418 U.S. 87, 117-18 (1974) (citing *United States v. Hess,* 124 U.S. 483, 487 (1888)); *United States v. Douglas,* 398 F.3d 407, 411 (6th Cir. 2005).  Specifically, the indictment must: (1) include all the elements of the charged offense and must give notice to the defendant of the charges he faces; and (2) be sufficiently specific to enable the defendant to plead double jeopardy in a subsequent proceeding, if charged with the same crime based on the same facts. *Id.* at 413.  "An indictment will usually be sufficient if it states the offense using the words of the statute itself, as long as the statute fully and unambiguously states all the elements of the offense." *United States  v. McAuliffe,* 490 F.3d 526, 531 (6th Cir. 2007), *cert. denied*, 128 S. Ct. 442 (2007) (quoting *United States v. Superior Growers Supply, Inc.,* 982 F.2d 173, 176 (6th Cir. 1992)).

The Ohio Supreme Court dealt with this issue as follows:

In proposition of law II, Foust argues that the indictment is defective because the felony-murder counts and the R.C. 2929.04(A)(7) specifications do not set forth every element of the charged offenses.  Foust also claims that his indictment for aggravated burglary in Count 8 is defective because the count fails to specify the offense that Foust intended to commit inside the house.

FN1.  Foust concedes that the R.C. 2929.04(A)(5) course-of-conduct specifications are correctly charged in the indictment.

Foust never challenged the sufficiency of the indictment before or during trial. Under Crim.R. 12(C), "[d]efenses and objections based on defects in the indictment" must be raised before trial. As stated in Crim.R. 12(H), "[f]ailure by the defendant to raise defenses or objections" within the time required "shall constitute waiver of the defenses or objections," although the court may grant relief from the waiver. *Accord State v. Williams* (1977), 51 Ohio St.2d 112, 117, 5 O.O.3d 98, 364 N.E.2d 1364; *State v. Carter* (2000), 89 Ohio St. 3d 593, 598, 734 N.E.2d 345.

No reason exists to grant Foust relief from his failure to object. In fact, no deficiency in the indictment exists. Under Crim.R. 7(B), an indictment "may be made in ordinary and concise language without technical averments or allegations not essential to be proved. The statement may be in the words of the applicable section of the statute, provided the words of that statute charge an offense, or in words sufficient to give the defendant notice of all the elements of the offense with which the defendant is charged." *See, also*, *State v. Childs* (2000), 88 Ohio St. 3d 558, 564, 728 N.E.2d 379.

**Felony-murder counts.** The indictment language for the aggravated felony-murder counts follows the wording of R.C. 2903.01(B), the felony-murder provisions of the aggravated-murder statute. Thus, these counts were properly worded in the indictment. *See State v. Murphy* (1992), 65 Ohio St. 3d 554, 583, 605 N.E.2d 884; *State v. Landrum* (1990), 53 Ohio St. 3d 107, 119, 559 N.E.2d 710. Moreover, the indictment included separate counts for the underlying felonies-Counts 8 through 19 and Counts 23 through 26-and these counts set forth the elements for these offenses. Reading the felony-murder counts in *pari materia* with the related felony counts provided ample notification of the elements of the underlying felonies-aggravated burglary, aggravated robbery, rape, kidnapping, and aggravated arson-that the state had to prove. *See State v. D'Ambrosio* (1993), 67 Ohio St. 3d 185, 197, 616 N.E.2d 909.

**R.C. 2929.04 specifications**. R.C. 2941.14(C) governs the form of death-penalty specifications in indictments and provides that "[t]he aggravating circumstance may be stated in the words of the subdivision in which it appears or in words sufficient to give the accused notice of the same." Here, the R.C. 2929.04(A)(7) specifications in the indictment tracked the language of R.C. 2929.04(A)(7), and each of the specifications named the underlying felonies that Foust allegedly committed. *See State v. Joseph* (1995), 73 Ohio St. 3d 450, 456, 653 N.E.2d 285 (R.C. 2941.14[C] "clearly provides that the specification is sufficient if the accused knows which subsection, or which aggravating circumstance * * * listed in R.C. 2929.04[A] has been alleged"). Thus, we find no defect in the R.C. 2929.04(A)(7) specifications.

*Foust*, 105 Ohio St. 3d at 142-43.

\* \* \*

We also reject Foust's constitutional arguments. An indictment meets constitutional requirements if it, "first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and second, enables

> him to plead an acquittal or conviction in bar of future prosecutions for the same offense. * * * 'Undoubtedly *the language of the statute may be used* in the general description of an offence, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged.'" (Emphasis added.) *Hamling v. United States* (1974), 418 U.S. 87, 117-118, 94 S. Ct. 2887, 41 L.Ed.2d 590, quoting *United States v. Hess* (1888), 124 U.S. 483, 487, 8 S. Ct. 571, 31 L.Ed. 516. Review of Foust's indictment shows that the aggravated-murder counts, the R.C. 2929.04(A)(7) specifications, and the aggravated-burglary count met these criteria.

*Foust*, 105 Ohio St. 3d at144.

Review of the indictment shows Foust received notice of the charges against him. The language of the aggravated murder statute was used. The indictments of the underlying felonies contained the elements of the offenses. Reading the elements of those crimes together with the related felony-murder counts gave Foust sufficient notice of what the State had to prove to convict him. The Court finds the decision of the Ohio court was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court.

### SEVENTH GROUND FOR RELIEF

In his Seventh Ground for Relief, Foust alleges a violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). Specifically, he argues the warnings allegedly read to him and those printed on the form of the statement that he signed do not include the statement that he could ask for an attorney any time, even after he began answering questions, and that if he asked for an attorney, questioning would have to stop. Although Foust raised this claim in the Ohio Supreme Court, the court held it was waived because counsel did not object at trial. The court reviewed it under plain error and found no error. Ohio's contemporaneous objection rule and review under a plain-error standard constitute adequate and independent state grounds barring federal review absent a showing of cause for the waiver and resulting prejudice. Foust argues that because appellate counsel raised ineffective assistance of counsel, the underlying issue of the validity of the indictment is preserved for review by the federal

56

court.  As discussed under the Sixth Ground, *supra*, a claim must be presented to the state courts under the same theory in which it is later presented in federal court.  Thus, this claim is procedurally defaulted.  Even though the underlying claim is defaulted, it must be addressed because the ineffective assistance of counsel theory was not.  If it were to be considered, the Court would find it to be without merit.

*Miranda* requires that a person in police custody being interrogated must be warned he has a right to remain silent, any statement he makes may be used as evidence against him, and he has the right to the presence of an attorney. These rights may be waived after the warnings have been received if the waiver is made voluntarily, knowingly and intelligently. *Miranda,* 384 U.S. at 444; *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Whether or not *Miranda* rights have been waived can be determined by answering two questions.

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than with intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran,* 475 U.S. at 421; *see Schneckloth v. Bustamonte,* 412 U.S. 218, 226 (1973); *McCalvin v. Yukins*, 444 F.3d 713, 719 (6th Cir. 2006), *cert. denied*, 127 S. Ct. 510 (2006). When a person in custody speaks to law enforcement officials with full awareness and understanding of the *Miranda* rights, his waiver is knowing and intelligent within the requirements of *Miranda*.  *Slaughter v. Brigano*, No. 1:01 CV 868 2005 WL 2453092, at *9 (S.D. Ohio Sept. 30, 2005) (citing *Colorado v. Spring*, 479 U.S. 564, 574-75 (1987)).

The state has the burden of proving by a preponderance of the evidence that a defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights. *Abela v. Martin,* 380 F.3d 915,

57

928 (6th Cir. 2004).  The Sixth Circuit, using a totality of the circumstances test to determine whether a petitioner's statements were involuntary, considers factors such as the age, education, and intelligence of the defendant; whether the defendant has been informed of his *Miranda* rights; the length of the questioning; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as deprivation of food or sleep. *Schneckloth,* 412 U.S. at 226; *McCalvin*, 444 F.3d at 719.

The United States Supreme Court held in *Edwards v. Arizona,* 451 U.S. 477, 484-85 (1981), that an accused having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or converses with the police.

The Ohio Supreme rejected this claim as follows:

> In proposition of law IV, Foust argues an inadequate *Miranda* advisement because he asserts police did not advise him that he could request counsel at any time during the interrogation and that police questioning would stop if he requested counsel.  Because of this alleged failure, Foust contends that his *Miranda* waiver was not knowingly and intelligently made and thus his confession should not have been admitted into evidence.

> However, Foust did not raise these specific issues in the trial court.  Instead, Foust filed a motion to suppress challenging the voluntariness of his confession based on his youth and his being intimidated by police.  Because Foust did not attack the adequacy of the *Miranda* warnings before the trial court, he has waived that issue absent plain error. *State v. Peagler* (1996), 76 Ohio St. 3d 496, 499-501, 668 N.E.2d 489 (on appeal, a defendant cannot introduce a new basis for a challenge made at trial).  Moreover, no plain error exists because the police properly apprised Foust of his *Miranda* rights.

> The record reveals that on April 7, 2001, the police arrested Foust, and, at that time, Detective Frank Costanzo advised Foust of his *Miranda* rights.  Foust stated that he understood those rights.

> Around 10:00 a.m. on April 7, at the police station, Detectives Michael Cipo and Denise Kovach interviewed Foust.  Before the interview, Detective Cipo again advised Foust of his *Miranda* rights.  Using an advisement-of-rights card issued by the police department, Detective Cipo advised Foust:

"You have a right to remain silent. Anything you say can and will be used against you in Court.  You have a right to consult with a lawyer before answering any questions and to have a lawyer with you during any questioning.  If you cannot afford a lawyer, one will be provided for you free of cost."

According to Detective Cipo, there was also a large placard with these same warnings posted on the wall in the interview room.  After being advised of his *Miranda* rights, Foust said that he understood his rights and did not need a lawyer, and then he talked with the police and confessed to the crimes.

After his oral confession, Foust agreed to provide a written statement.  After the written statement was prepared, but before Foust signed it, Detective Kovach again read Foust his *Miranda* rights, using the preprinted advisement of rights on the first page of the statement.  Detective Kovach advised Foust:

"Before making any written statement that may be used against you at the time of your trial, we wish to repeat the instructions issued prior to oral interrogation; that you have the right to counsel, appointed or retained, before interrogation, that you have the right to remain silent, and that anything you say may be used against you. You have the right to have an attorney present while making this statement."

Following this advisement of rights, Foust was asked, "Do you understand your rights as stated above?" and "Do you care to make any written statement?" Foust answered yes to both questions, marked his agreement on the form, and signed his name underneath the advisement of rights. Foust then signed each page of his written statement. On the last page of his statement, Foust answered no to the question "Did anyone threaten you or promise you anything to make this statement?" He answered yes to the question "Having read your statement, do you find it to be true?" Foust then signed the last page of his confession.

**Adequacy of the *Miranda* warnings.** Foust claims that the police provided him inadequate *Miranda* warnings because they did not tell him he could ask for an attorney at any time, including after the questioning began, and that if he asked for an attorney once the questioning had started, all questioning would stop.

*Miranda v. Arizona* (1966), 384 U.S. 436, 478-479, 86 S. Ct. 1602, 16 L.Ed.2d 694, requires that before questioning a suspect in custody, law-enforcement officials must inform the suspect (1) that he or she has the right to remain silent, (2) that his or her statements may be used against him or her at trial, (3) that he or she has the right to have an attorney present during questioning, and (4) that if he or she cannot afford an attorney, one will be appointed.

The Supreme Court has never insisted that *Miranda* warnings be given in the exact form described in that decision.  Instead, the court has stated that " 'the "rigidity" of *Miranda* [does not] exten[d] to the precise formulation of the warnings given a criminal defendant,' and that 'no talismanic incantation [is] required to satisfy its strictures.' " *Duckworth v. Eagan* (1989), 492 U.S. 195, 202-203, 109 S. Ct. 2875, 106 L.Ed.2d 166, quoting *California v. Prysock* (1981), 453 U.S. 355, 359, 101 S. Ct. 2806, 69 L.Ed.2d 696.  "Reviewing courts therefore need not examine *Miranda* warnings as if construing a will or defining the terms of an easement.  The inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by *Miranda*.'" *Duckworth* at 203, 109 S. Ct. 2875, 106 L.Ed.2d 166, quoting *Prysock* at 361, 101 S. Ct. 2806, 69 L.Ed.2d 696.

Police do not have to provide additional warnings to a suspect beyond what *Miranda* requires.  Indeed, in *State v. Edwards* (1976), 49 Ohio St. 2d 31, 39-41, 3 O.O.3d 18, 358 N.E.2d 1051, we found that *Miranda* warnings were adequate even though the defendant was not explicitly asked whether he wanted an attorney.  Similarly, in *State v. Dailey* (1990), 53 Ohio St. 3d 88, 90-91, 559 N.E.2d 459, *Miranda* warnings were deemed adequate even though they did not explicitly refer to "appointment of counsel."

Federal courts have also rejected challenges to the adequacy of *Miranda* warnings based on the absence of additional warnings.  *See, e.g.*, *United States v. Ricks* (C.A.6, 1993), 989 F.2d 501, unpublished opinion, 1993 WL 78781 (suspect need not be informed that he has the right to stop answering questions at any time); *United States v. Lares-Valdez* (C.A.9, 1991), 939 F.2d 688 (suspect need not be advised of the right to have questioning stopped at any time, of the option to answer some questions but not others, or that some questions may call for incriminating responses); *United States v. Caldwell* (C.A.8, 1992), 954 F.2d 496, 501-504 (suspect need not be explicitly advised of his right to counsel before and during questioning); *United States v. DiGiacomo* (C.A.10, 1978), 579 F.2d 1211, 1214 (no express requirement under *Miranda* to advise suspects of the right to terminate questioning).

In this case, the police fully advised Foust of his rights as required by *Miranda*.  Foust was advised of (1) his right to remain silent (and was warned that any statement he made could and would be used against him in court), (2) his right to have a lawyer present prior to and during interrogation, and (3) his right to have a lawyer appointed at no cost if he could not afford one.  However, police were not required to also advise Foust of his right to ask for a lawyer and stop questioning at any time after the interrogation was underway.  Indeed, "[t]here are numerous circumstances and ways in which the right to silence may be invoked and officers could not possibly warn of all of them.  Having advised of the essential rights, the officers are not obliged to warn of any or all of the circumstances or manners in which the right may be invoked." *United States v. Alba* (D.Conn.1990), 732 F. Supp. 306, 310.  Moreover, when he was advised of his *Miranda* rights, Foust never asked for a further explanation of them.  Thus, the *Miranda* warnings Foust received were proper.

60

**Voluntariness.**  The "totality of the circumstances" surrounding Foust's confession also shows that Foust voluntarily waived his *Miranda* rights and that his confession was knowingly, intelligently, and voluntarily made.  *See Moran v. Burbine* (1986), 475 U.S. 412, 421, 106 S. Ct. 1135, 89 L.Ed.2d 410.  First, the police never subjected Foust to threats or physical abuse or deprived him of food, sleep, or medical treatment.  Nor did the police make any promises to Foust in return for his cooperation.  Foust was in police custody for only two and one-half hours prior to being interviewed.  Furthermore, the interview lasted only two hours.

Second, Foust appeared to be mentally alert and not under the influence of drugs or alcohol at the time of the interview.  During the police interview, Foust stated that he had completed a GED course and had the highest score in his class.  Thus, we find no evidence of police coercion or overreaching showing that Foust's confession was involuntary.  *See State v. Eley* (1996), 77 Ohio St. 3d 174, 178-179, 672 N.E.2d 640.

Based on the foregoing, we overrule proposition IV.

*Foust*, 105 Ohio St. 3d at 147-150.

Based on the totality of the circumstances, the Court finds the Ohio court's determination that Foust's *Miranda* rights were not violated is reasonable. As the Ohio court found, Foust was not subject to physical threats or physical abuse, he was not deprived of sleep or food, he was in police custody for only two and a half hours before questioning began and questioning lasted only two hours. He appeared mentally alert and not under the influence of drugs or alcohol, and he stated he completed a GED course and received the highest score in the class.  Foust cited *Duckworth v. Eagan*, 492 U.S. 195, 202-01 (1989).  In *Duckworth*, the Supreme Court reviewed the *Miranda* warnings.  The statement that the detainee be told he had a right to stop talking and could ask for an attorney any time is not included.[7]  In fact, the Court noted it never insisted the *Miranda* warnings be given in the exact wording set forth in *Miranda*.  This claim is without merit.

---

[7]

The Sixth Circuit held in an unpublished opinion that a suspect need not be informed he has the right to stop answering questions at any time.  *United States v. Ricks*, No. 92-5503, 1993 WL 78781, at *3 (6th Cir. 1993) (unpublished).

**EIGHTH GROUND FOR RELIEF**

In his Eighth Ground for Relief, Foust asserts his death sentence is void or voidable because the trial court in its sentencing determination:

(a)     improperly considered the absence of statutory mitigating factors not offered by Petitioner;

(b)     weighed the nature and circumstances of the offenses on the side of aggravation and therefore in favor of imposition of the death penalty;

(c)     failed to merge capital counts;

(d)     improperly weighed non-statutory aggravating circumstances;

(e)     failed to consider Petitioner's remorse for his actions; and

(f)     failed to consider the effect of the deaths of Petitioner's siblings on Petitioner.

Respondent concedes sub-claims (c) and (f) were raised in the Ohio Supreme Court and are therefore preserved for federal habeas review. Sub-claim (a) was raised in Foust's *Murnahan* application. However, the claim must be presented to the state courts under the same theory in which it is later presented in federal court.  *See Sneed v. Johnson*, No. 1:04 CV 588, 2007 WL 709778, at *33 (N.D. Ohio Mar. 2, 2007) (claims first raised in an application to reopen are procedurally defaulted because they were never presented to the Ohio courts under the same theory as they were raised in the petition); *Stojetz v. Ishee*, 389 F. Supp. 2d 858, 898-99 (S.D. Ohio 2005) (underlying constitutional claim cannot be preserved for review by being included in a Rule 26(B) application for reopening). Sub-claim (d) was raised in the Ohio Supreme Court, as Foust contends, but not addressed by the court (Apx. Vol. 2, p. 126).  The Court will consider this sub-claim to be preserved for federal habeas review. Foust agrees that sub-claims (b) and (e) were not raised in the Ohio courts.  Therefore, sub-claims (b) and (e) are procedurally defaulted.

62

A.    **Trial Court Improperly Considered the Absence of Statutory Mitigating Factors Not Offered by Petitioner**

In its sentencing opinion, the court listed the seven possible statutory mitigating factors it could consider, and it commented upon whether any evidence was presented as to each of them (Apx. Vol. 1, pp. 238-40).  In *DePew*, the Ohio Supreme Court stated:

> R.C. 2929.04(B) and (C) deal with mitigation and were designed to enable the defendant to raise issues in mitigation and to facilitate his presentation thereof.  If the defendant chooses to refrain from raising some of or all of the factors available to him, those factors not raised may not be referred to or commented upon by the trial court or the prosecution.  When the purpose of these sections is understood, it actually is clear that such comment is appropriate only with regard to those factors actually offered in mitigation by the defendant.

*DePew*, 38 Ohio St. 3d at 289.  However, as long as the highest state court has independently re-weighed the aggravating circumstances and mitigating factors excluding the extra-statutory factors improperly relied on by the lower courts, no constitutional claim exists.  *Fox v. Coyle*, 271 F.3d 658, 667 (6th Cir. 2001) (citing *Barclay v. Florida*, 463 U.S. 939, 958 (1983)).  *See Romano v. Oklahoma*, 512 U.S. 1, 11 (1994) (state appellate courts can cure weighing defects by correctly re-weighing aggravating circumstances and mitigating factors); *Richmond v. Lewis,* 506 U.S. 40, 48-49 (1992) (same); *Montgomery v. Bagley*, 482 F. Supp. 2d 919, 960 (N.D. Ohio 2007) (same).  Here, the Ohio Supreme Court reviewed and independently weighed the aggravating circumstances and mitigating factors as required by Ohio law.

B.    **Trial Court Weighed the Nature and Circumstances of the Offenses on the Side of Aggravation and Therefore in Favor of Imposition of the Death Penalty**

A trial court is limited to considering only statutory aggravated circumstances in determining whether the death penalty is appropriate.  Thus, the nature and circumstances of the offense, which are not aggravating circumstances, may be weighed against the aggravating circumstances but not as

63

aggravating factors themselves.  *See* Ohio Revised Code § 2929.04(B).  Under Ohio law, courts may consider the nature and circumstances of an offense in determining whether the aggravating circumstances(s) outweigh the mitigating factors.  *Fox,* 271 F.3d at 669. *See State v. Stumpf,* 32 Ohio St. 3d 95, syllabus ¶ 1 (1987) ( "Under R.C. 2929.03(F), a trial court or three-judge panel may rely upon and cite the nature and circumstances of the offense as reasons supporting its finding that the aggravating circumstances were sufficient to outweigh the mitigating factors.").  The Sixth Circuit stated in *Fox*:

> The nature and circumstances of a crime may be "aggravating " in the sense that they are relevant and tend to reinforce the conclusion that a death sentence should be imposed.  This does not mean that the facts surrounding a crime can be set forth in the indictment as a specified statutory aggravating circumstance, nor may they be deemed an "aggravating circumstance" in terms of determining death eligibility.  Thus, the fact that a particular murder was, for instance, particularly cruel or heinous is relevant to the determination of the appropriateness of actually imposing a death sentence on a death-eligible perpetrator, even though the fact of cruelty or heinousness would not, of itself, be sufficient to bring the crime within the scope of any section of R.C. 2929.04(A), nor could that fact be used to cause the defendant to become death-eligible.  *State v. Gumm,* 73 Ohio St. 3d 413, 420-21 (1995) (internal citations omitted).

*Fox*, 271 F.3d at 669.

Foust argues the trial court weighed the nature and circumstances of the offenses on the side of aggravation based on the following statement in the trial court's sentencing opinion.

> The background unquestionably helped the panel place the defendant into context. Nevertheless, ultimately we could not conclude that it was insufficient to mitigate the punishment for a series of criminal acts of outrageous depravity, violence, and cruelty.

(Sentencing Opinion, p. 6; Apx. Vol. 1, p. 241.)  The statement followed the court's consideration of the mitigating factors introduced by Foust through his parents and Dr. Karpawich.  The court did not say the death sentence was imposed because the crime was outrageously violent, depraved and cruel. It merely commented the mitigating factors introduced by Foust did not outweigh the aggravating

64

circumstances. While the characterization described the aggravating circumstances, the court did use the statutory aggravating circumstances set forth in the indictment. The trial court concluded that, "[w]hile the panel agrees that several mitigating factors have been raised, we are left with the inescapable conclusion that the aggravating circumstances that were established at trial far outweigh any and all of those mitigating factors by proof beyond a reasonable doubt" (Apx. Vol. 1, p. 243).

### C.    Trial Court Failed to Merge Capital Counts

Foust contends the court should have merged the aggravated murder convictions with the capital specifications. Because the panel never merged those counts and specifications, or separated the specific charges and specifications before weighing aggravation against mitigation, it allegedly impermissibly tipped the weighing process in favor of death and defeated the constitutional requirement of reliability in capital sentencing.

The Ohio Supreme Court ruled on this issue as follows:

In proposition of law IX, Foust argues that the three-judge panel failed to merge the aggravated-murder counts and the duplicative aggravating circumstances prior to sentencing him. He also claims that the trial court considered nonstatutory aggravating factors as part of the course-of-conduct specification.

Aggravated-murder counts involving the same victim are to be merged for sentencing. *State v. Lynch,* 98 Ohio St. 3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 132; *State v. Lawson* (1992), 64 Ohio St. 3d 336, 351, 595 N.E.2d 902.  Here, review of the sentencing journal entry reveals that the three-judge panel imposed a death sentence "as to each of counts 2, 3, 4, 5, and 6," pursuant to each conviction, but obviously considered these counts as merged.

As to the multiple aggravating circumstances, the rule is that "where two or more aggravating circumstances arise from the same act or indivisible course of conduct and are thus duplicative, the duplicative aggravating circumstances will be merged for purposes of sentencing." *State v. Jenkins,* 15 Ohio St. 3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph five of the syllabus. However, in the case at bar, the five R.C. 2929.04(A)(7) aggravating circumstances (rape, kidnapping, aggravated burglary, aggravated robbery, and aggravated arson) are not duplicative because none arose from the same act or indivisible course of conduct as another. Moreover, as discussed in proposition VII, the facts established that Foust, after breaking into the Coreano home,

raped and kidnapped Damaris with a separate animus for each offense. The facts also showed that Foust's theft of property from inside the house, his setting the house on fire, and his theft of Jose's car constituted separate and distinct acts, each committed with a separate animus. *See State v. Jones* (2001), 91 Ohio St. 3d 335, 349, 744 N.E.2d 1163.

Furthermore, the course-of-conduct specification, R.C. 2929.04(A)(5), and the R.C. 2929.04(A)(7) specification need not be merged.  The R.C. 2929.04(A)(7) specifications alleged that the aggravated murder of Jose occurred during the course of rape, kidnapping, aggravated burglary, aggravated robbery, and aggravated arson. In contrast, the course-of-conduct specification alleged that Jose's murder was part of a course of conduct in which Foust also attempted to kill Damaris.  Thus, the R.C. 2929.04(A)(5) and (A)(7) specifications did not arise from the same course of conduct and are not duplicative.  *See State v. Franklin,* 97 Ohio St. 3d 1, 2002-Ohio-5304, 776 N.E.2d 26, ¶ 51-52; *State v. Robb* (2000), 88 Ohio St. 3d 59, 85, 723 N.E.2d 1019; *State v. Frazier,* 61 Ohio St. 3d at 256, 574 N.E.2d 483.

Finally, Foust points out that the panel considered nonstatutory aggravating factors as part of the course-of-conduct specification. In its sentencing opinion, the panel stated, "[T]he killing of Jose Coreano was part of a *course of conduct* that included all the other crimes committed by the defendant that night: the aggravated burglary of the home, rape and gross sexual imposition upon Damaris Coreano, aggravated robbery, and aggravated arson.  These are no longer separate crimes, but have been tied together in a Gordian knot of perversity and brutality."

The R.C. 2929.04(A)(5) specification applies only to "a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender."  Thus, the panel improperly referred to other felony offenses that Foust committed as part of a course of conduct, an error we will correct during our independent review. *See State v. Fox* (1994), 69 Ohio St. 3d 183, 191-192, 631 N.E.2d 124.

Based on the foregoing, proposition IX has some merit but does not result in error sufficient to warrant a reversal or retrial.

*Foust*, 105 Ohio St. 3d at 163-165.

Under Ohio law, aggravated murder counts should be merged with specifications when they arise "from the same acts and are committed with the same animus."  *State v. Cooey,* 46 Ohio St. 3d 20 (1989). The Ohio Supreme Court correctly found the specifications as to Jose Coreano and Demaris Coreano did not arise from the same course of conduct and need not have been merged.  Any error may be cured by the independent weighing of the mitigating factors against the properly merged

66

aggravating circumstances.  *State v. Combs*, 62 Ohio St. 3d 278, 286 (1991) (citing *Clemons v. Mississippi*, 494 U.S. 738, 764 (1990)).  The Ohio Supreme Court corrected any error during its independent review. *See Spisak v. Mitchell*, 465 F.3d 684, 712 (6th Cir. 2006), *vacated on other grounds, Hudson v. Spisak*, 128 S. Ct. 373 (2007), *reinstated*, 512 F.3d 852 (2008) (holding Ohio Supreme Court's independent re-weighing was sufficient to remedy any error).

**D.    Trial Court Improperly Weighed Non-statutory Aggravating Circumstances**

Foust contends without further explanation that the trial court improperly weighed  non-statutory aggravating circumstances because it treated as an aggravating circumstance that he committed gross sexual imposition.  Examination of the trial court's sentencing opinion shows the court was merely summarizing the history of the case. The court stated:

> In summary, the panel found that, early in the morning of March 31, 2001, the defendant broke into a home located at 2394 West 40th Street, in the City of Cleveland, killed Jose Coreano by a single blow with a hammer or other blunt instrument, repeatedly raped and committed gross sexual imposition upon his daughter, then tied her to a bathtub and set the house on fire, after stealing various items.

(Apx. Vol. 1, pp. 237-38.)  There is no further mention of gross sexual imposition. The trial court's opinion made it clear that in weighing the mitigating factors, it was only considering the aggravated circumstances proved at trial.

**E.    Trial Court Failed to Consider Petitioner's Remorse for His Actions**

Foust asserts remorse was shown by his cooperation with police and in his unsworn statement during the penalty phase of the trial (Tr. Vol. 2, pp. 575-76).  In *Lockett v. Ohio*, 438 U.S. 586, 602-04 (1978) and *Eddings v. Oklahoma*, 455 U.S. 104, 113-14 (1982), the Supreme Court held that in capital cases, the sentencer must consider any and all mitigating factors.  However, the trial and appeals courts determine the weight to be given a mitigating factor. *Id.* at 114. The trial court in Foust's case

67

considered the fact that he cooperated with the police after he was arrested, and that he showed

remorse during his unsworn statement.  However, the court noted he had been hiding for a full week

after the murder.

> **F.     Trial Court Failed to Consider the Effect of the Deaths of Petitioner's
> Siblings on Petitioner**

The Ohio Supreme Court addressed this issue as follows:

> Foust argues that the panel did not properly weigh as a mitigating factor the tragic
> losses of his older brother and younger sister. In the sentencing opinion, the panel
> considered evidence that "[t]he defendant's one significant role model, an older
> brother, was murdered, execution-style" as a possible R.C. 2929.04(B)(7) mitigating
> factor. However, the panel concluded that "sympathy for the tragic manner in which
> the defendant lost his older brother and younger sister may help explain his conduct but
> does not support mitigation of the sentence."
>
> Examination of the sentencing opinion reveals that the panel considered the tragic
> deaths of Foust's brother and sister as mitigating evidence, but chose to give it no
> weight. "There is 'no requirement' that the trial court explain 'how it decides how
> much weight to give any one factor.' Moreover, '[t]he weight, if any, given to a
> mitigating factor is a matter for the discretion of the individual decisionmaker.'" *State
> v. Thomas*, 97 Ohio St. 3d 309, 2002-Ohio-6624, 779 N.E.2d 1017, ¶ 81, quoting *State
> v. Filiaggi* (1999), 86 Ohio St. 3d 230, 245, 714 N.E.2d 867.  Thus, the panel could
> reasonably assign whatever weight, if any, it deems appropriate for that mitigating evidence.

*Foust*, 105 Ohio St. 3d 137, 165-66.

The trial court did consider the death of Foust's brother and sister. Again, the trial and appeals

courts determine the weight to be given a mitigating factor. *Eddings*, 455 U.S. at 114.

This Court finds the decision of the Ohio court was not contrary to, or an unreasonable

application of, clearly established federal law, as determined by the United States Supreme Court as

to sub-claims 3, 4 and 6. Sub-claims 1, 2 and 5 are without merit. The Ohio Supreme Court did not

unreasonably apply federal law in independently re-weighing the aggravating and mitigating factors,

and upholding Foust's convictions and sentence.  While it is undisputed the trial court committed error

68

in not merging the death penalty specifications, the Ohio Supreme Court's independent re-weighing was sufficient to remedy any error.  *Spisak,* 465 F.3d at 712.

### NINTH GROUND FOR RELIEF

Foust asserts the cumulative effect of the errors addressed in the First through Eighth Grounds for Relief render his trial and sentence fundamentally unfair in violation of his right to Due Process, and it left him facing a death sentence imposed in violation of the constitutional protection against cruel and unusual punishment. This claim was presented to the Ohio Supreme Court and is therefore preserved for federal habeas review.

The Sixth Circuit in *Lorraine v. Coyle*, 291 F.3d 416, 418 (6th Cir. 2002) noted the Supreme Court has not held distinct constitutional claims can be cumulated to grant habeas relief.   The Sixth Circuit ruled in *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005), *cert. denied,* 127 S. Ct. 557 (2006), that even constitutional errors that would not individually support habeas relief cannot be cumulated to support habeas relief.  *See Williams v. Anderson,* 460 F.3d 789, 816 (6th Cir. 2006) (the law of this Circuit is that cumulative error claims are not cognizable on habeas review because the Supreme Court has not spoken on this issue).  Further, Foust has not established any error occurred in the state courts.  Thus, this claim is without merit.  *Baze v. Parker*, 371 F.3d 310, 330 (6th Cir. 2004), *cert. denied*, 544 U.S. 931 (2005).

### TENTH GROUND FOR RELIEF

Foust asserts that Ohio's death penalty statutes are unconstitutional.  He has included a long list of reasons in support of this contention.  Respondent agrees they have been presented to the state court and are therefore preserved for federal habeas review.  Most, if not all, of these claims have already been rejected by the Sixth Circuit.

**A.     Prosecutors Have Unregulated Discretion in Determining Who Will be Charged with the Death Penalty**

In *Gregg v. Georgia*, 428 U. S. 153, 188 (1976), the Supreme Court set forth the following capital sentencing procedures likely to prevent arbitrary and capricious imposition of the death penalty: (1) consideration of a pre-sentence report by the sentencing authority; (2) jury sentencing where the jury is adequately informed and given meaningful standards to guide its use of the information; (3) a bifurcated guilt phase/sentencing phase trial; (4) weighing of aggravating circumstances and mitigating factors; (5) a sentencing decision based on specific findings; and (6) meaningful appellate review.  Ohio's death penalty statutes contain these preventative sentencing procedures.  *Buell*, 274 F.3d at 367.  *See Byrd*, 209 F.3d at 539.

**B.     The Death Penalty Scheme Fails to Require Premeditation or Deliberation**

The Constitution does not require a premeditated and conscious desire to kill before a death sentence can be imposed.  *Tison v. Arizona*, 481 U.S. 137, 158 (1989); *Hartman v. Bagley*, 333 F. Supp. 2d 632, 677 (N.D. Ohio 2004), *aff'd,* 492 F.3d 347 (6th Cir. 2007).

**C.     The Death Penalty Scheme Requires Capital Defendants to Prove Mitigating Factors by a  Preponderance of the Evidence**

The Supreme Court rejected this argument in *Walton v. Arizona*, 497 U.S. 639, 650 (1990), *overruled on other grounds by Ring v. Arizona,* 536 U.S. 584 (2002) (overruling *Walton* to the extent it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty).   A state law which places the burden of proving mitigating factors on the defendant is not *per se* unconstitutional as long as a state's methods of allocating the burden of proof does not lessen the state's burden to prove every element of the offense charged, or to prove the existence of aggravating circumstances. The state still has the burden to show the existence of aggravating circumstances that outweigh the existence of any mitigating factors.  *Wiles v. Bagley*,

70

2005 No. 1:02 CV 992, WL 1181859, at *43 (N.D. Ohio May 18, 2005); *Madrigal v. Bagley*, 276 F.

Supp. 2d 744, 780 (N.D. Ohio 2003), *aff'd,* 413 F.3d 548 (6th Cir. 2005).  Further, in *Buchanan v.*

*Angelone*, 522 U.S. 269, 275-76 (1998), the Supreme Court held the Eighth Amendment does not

require the jury be instructed on the concept of mitigating evidence or on particular statutory

mitigating factors, and states are free to structure the jury's consideration of mitigation so long as it

does not preclude the jury from giving effect to it.  *Smith v. Mitchell,* 348 F.3d 177, 214 (6th Cir.

2003).

> **D.**    **The Death Penalty Scheme Permits the Trier of Fact to Consider**
> **Aggravating Circumstances at the Trial Phase**

In *Coleman v. Mitchell*, 268 F.3d 417, 433 (6th Cir. 2001), the Sixth Circuit held Ohio's

scheme is consistent with *Lowenfield v. Phelps*, 484 U.S. 231, 244-45 (1988), where the Supreme

Court stated:

> The use of "aggravating circumstances" is not an end in itself, but a means of
> genuinely narrowing the class of death-eligible persons and thereby channeling the
> jury's discretion. We see no reason why this narrowing function may not be performed
> by jury findings at either the sentencing phase of the trial or the guilt phase.

> **E.**    **The Death Penalty Scheme Permits the Death Penalty to be Applied in an**
> **Arbitrary, Capricious and Discriminatory Manner**

The Sixth Circuit resolved this issue*.  Buell,* 274 F.3d at 367.  *Buell* noted the Ohio death

penalty statutes include several of the capital sentencing procedures that the Supreme Court held in

*Gregg*, 428 U.S. at 188-95, specifically to reduce the likelihood of arbitrary and capricious imposition

of the death penalty, which are discussed above in Part A.  Ohio's death penalty statute is carefully

drafted so the likelihood of an arbitrary and capricious imposition of the death penalty is reduced.  *Id.*

*See Wickline v. Mitchell*, 319 F.3d 813, 824 (6th Cir. 2003); *Binge v. Johnson*, 312 F. Supp. 2d 978,

1031 (S.D. Ohio 2004), *aff'd*, 474 F.3d 236 (6th Cir. 2007), *cert. denied*, 128 S. Ct. 626 (2007).

**F.      The Death Penalty Scheme Devalues Mitigation**

Foust contends the Ohio death penalty system provides no method to ensure a proper weighing and consideration of mitigating factors is accomplished. According to the Supreme Court, "[T]he Eighth Amendment does not require states to adopt specific standards for instructing juries on mitigating circumstances." *Buchanan*, 522 U.S. at 274.  Thus, the absence of any standard to balance the weight of mitigating circumstances with aggravating circumstances is inconsequential. *Dickerson v. Mitchell*, 336 F. Supp. 2d 770, 791 (N.D. Ohio 2004), *rev'd on other grounds*, 453 F.3d 690 (6th Cir. 2006); *Hartman*, 333 F. Supp. 2d at 675; *Madrigal*, 276 F. Supp. 2d at 807.

**G.      The Death Penalty Scheme Permits a Defendant Convicted of Capital Murder to be Sentenced to Death Despite the Absence of any Independent Aggravating Circumstances**

Although he has included this sub-claim on his list of the unconstitutionality of Ohio's death penalty scheme in his Traverse, Foust has not presented any further argument.  Therefore, the Court will not discuss this sub-claim.

**H.      The Death Penalty Scheme Fails to Require Juries and Trial Judges to Determine that Death is the Only Appropriate Punishment While Imposing Such a Requirement on Reviewing Courts**

After the sentencer has found a defendant convicted of aggravated murder is eligible for the death penalty because one or more aggravating circumstances have been found beyond a reasonable doubt, a separate review of whether the aggravating circumstances outweigh the mitigating factors is conducted to determine the appropriateness of the death penalty. *Buell*, 274 F.3d at 368. This requirement gives the sentencing authority sufficient information to enable it to consider the character and individual circumstances of the defendant.  The court in *Buell,* 274 F.3d at 368-69, found this procedure sufficiently discerns who deserves the death penalty.  *Benge v. Johnson*, 312 F. Supp. 2d 978, 1035-36 (S.E. Ohio 2004); *Jamison v. Collins*, 100 F. Supp. 2d 647, 765-66 (S.D. Ohio 2000).

72

*See Jones v. Bradshaw*, 489 F. Supp. 2d 786, 843-44 (N.D. Ohio 2007) (holding no such constitutional mandate exists requiring the state to prove that death is the only appropriate remedy).

**I.      The Death Penalty Scheme Encourages Capital Defendants to Plead Guilty**

Ohio Criminal Rule 11(C)(3) allows a judge, in the interest of justice, to dismiss capital specifications if the defendant pleads guilty or no contest. The specifications are not automatically dismissed.  If the judge does not dismiss the specifications, the rule requires three judges to determine if the offense was aggravated murder and, if so, they must determine the presence or absence of the specified aggravating circumstances, if any, compared to any mitigating circumstances and impose sentence accordingly. In *United States v. Jackson*, 390 U.S. 570 (1968), the Supreme Court held unconstitutional a statute that automatically dismissed the capital specifications when a defendant pled guilty or waived a jury. The death penalty could be imposed if recommended by a jury, but the statute did not include a procedure for imposing the death penalty on a defendant who waived a jury or pled guilty.  However, the Supreme Court has never decided that a statute allowing a defendant to avoid the possibility of a death sentence with a guilty plea was invalid.  *Benge,* 312 F. Supp. 2d at 1033-34; *Frazier*, 188 F. Supp. 2d at 839; *Jamison*, 100 F. Supp. 2d at 763.  There is no *per se* rule against encouraging guilty pleas. *Benge*, 312 F. Supp. 2d at 1034 (citing *Corbitt v. New Jersey*, 439 U.S. 212, 223 (1978)). Under Ohio Criminal Rule 11(C)(3), a defendant who pleads guilty to an indictment containing a death penalty specification can still receive the death penalty.  *Id.*  The Sixth Circuit has rejected the same argument.  *See Cooey*, 289 F.3d at 924-25.

**J.      The Death Penalty Is Not the Least Restrictive Means for Accomplishing Society's Objectives in Punishing Criminals Nor Does it Further a Compelling State Interest**

The Supreme Court held it could not require a state legislature to select the least restrictive penalty so long as the penalty selected is not inhumanely cruel or disproportionate to the crime.

73

Further, the Court in *Gregg* rejected this argument, finding the death penalty serves compelling state interests, and it is not "invariably disproportionate to the crime" of murder. *Gregg*, 428 U.S. at 183, 187; *Williams,* 380 F.3d at 966; *Greer v. Mitchell*, 264 F.3d 663, 690 (6th Cir. 2001); *Madrigal*, 276 F. Supp. 2d at 809.

### K. Ohio's Capital Punishment System Has Resulted in the Imposition of Death Penalties in a Racially Discriminatory Manner

Foust contends Ohio's death penalty scheme is unconstitutional because it imposes the death penalty in a racially discriminatory manner. In order to succeed on this sub-claim, Foust must prove the existence of purposeful discrimination, i.e., that the decisionmakers in his case acted with discriminatory purpose. *McCleskey v. Kemp,* 481 U.S. 279, 292 (1987). *See Wiles*, 2005 WL 1181859, at *43. The Sixth Circuit has rejected challenges claiming race is a factor in the application of the death penalty in Ohio. *Greer*, 264 F.3d at 690 (petitioner failed to show a constitutionally significant risk of racial bias affecting Ohio's death penalty statute). The Court in *McCleskey*, 481 U.S. at 297, stated, "Because discretion is essential to the criminal process, we would demand exceptionally clear proof before we would infer that the discretion has been abused." In *United States v. Henderson*, 485 F. Supp. 2d 831, 863 (S.D. Ohio 2007), the court found that of the FBI's crime statistics for 2004, there were 14,121 reported homicides in the United States. Of that number, 50% of the offenders were African-American and 47.6% were Caucasian. While the 14,121 figure incorporates all homicides, including those that are and are not death eligible, it did not lend support to defendant's argument that racial discrimination underlies the government's charging practices. Foust has not shown the existence of racial discrimination.

**L.      Ohio's System Allows an Aggravating Circumstance to Merely Repeat an Element of Capital Murder**

In *Williams,* 529 U.S. at 392, n. 16 (citing *Lowenfield,* 484 U.S. at 231), the Supreme Court held an aggravating circumstance may duplicate an element of the capital offense if the class of death-eligible defendants is sufficiently narrowed by the definition of the offense itself.  *See Cooey*, 289 F.3d at 926.  The Ohio death penalty system satisfies Supreme Court law that requires a statutory scheme to limit or narrow the class of death-eligible defendants. Ohio's scheme was upheld in *Lowenfield,* 484 U.S. at 246.  It does not authorize an automatic, mandatory death penalty for felony murders. A state must not only prove the defendant caused the death of another to establish the aggravating circumstance, but it also must prove the defendant was the principal offender in the commission of the aggravated murder, or that the aggravated murder was committed with prior calculation and design. *Jones,* 489 F. Supp. 2d at 843.

**M.      Ohio's System Employs an Inadequate System of Proportionality and Appropriateness Review**

This claim is without merit because no proportionality review is required.  *Buell*, 274 F.3d at 368 (citing *Pulley v. Harris*, 465 U.S. 37, 44-51 (1984)). Since Ohio law requires proportionality review, the review must be consistent with constitutional requirements.  *Dickerson*, 336 F. Supp. 2d at 789.  A trial judge has the duty to re-weigh the aggravating circumstances and mitigating factors before determining whether to impose a death sentence or a life sentence, Ohio Revised Code § 2929.03(D)(3), and to state this finding in a separate opinion.  Ohio Revised Code § 2929.03(F). The judge must examine the state's proportionality review to determine whether the imposition of a death sentence on the petitioner is patently unjust or "shocks the conscience."  The Court is not to second guess the state court's comparison of other cases in which the death penalty was imposed.  *Id*. at 789; *Taylor v. Mitchell*, 296 F. Supp. 2d 784, 839 (N. D. Ohio 2003). Because proportionality review is not

75

required by the Constitution, states have a great latitude in defining the pool of cases used for comparison.  *Wickline*, 319 F.3d at 824. The Sixth Circuit has held that by limiting proportionality review to previous cases wherein the death penalty has been imposed, the Ohio Supreme Court has complied with the latitude allowed.  *Id.*; *Buell*, 274 F.3d at 369; *see also Beuke v. Houk*, 2008 FED App. 0290P (6th Cir.)

### N.  Ohio's System of Lethal Injection Inflicts Cruel and Unusual Punishment in Violation of the Eighth and Fourteenth Amendments

Ohio Revised Code § 2949.22 provides:

A) Except as provided in division (C) of this section, a death sentence shall be executed by causing the application to the person, upon whom the sentence was imposed, of a lethal injection of a drug or combination of drugs of sufficient dosage to quickly and painlessly cause death. The application of the drug or combination of drugs shall be continued until the person is dead.  The warden of the correctional institution in which the sentence is to be executed or another person selected by the director of rehabilitation and correction shall ensure that the death sentence is executed.

The Supreme Court has held the death penalty to be constitutional. *Gregg,* 428 U.S. at 179. Recently, the Court held Kentucky's method of execution, the same method used by Ohio, is constitutional.  *Baze v. Rees*, _____U.S._____, 128 S. Ct. 1520 (Apr. 16, 2008).[8]  Some risk of pain is inherent in any method of execution, even if only caused by error in following the required procedure.  *Id.* at *8.  Cruel and unusual punishment occurs where an execution method presents a substantial or objectively intolerable risk of serious harm. *Id.* at *10. "Simply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of 'objectively intolerable risk of harm' that qualifies as cruel and unusual." *Id*. The Court concluded a state method of execution similar to the protocol used by Kentucky would not create a risk that meets that standard.

---

[8]

At least 30 of 36 states use the same method of execution as Kentucky. *Baze*, 128 S. Ct. at 1427.

## CONCLUSION

The Sixth Circuit has determined neither a blanket grant nor a blanket denial of a certificate of appealibility ("COA") is an appropriate means by which to conclude a capital habeas case as it "undermine[s] the gate keeping function of certificates of appealability, which ideally should separate the constitutional claims that merit the close attention of counsel and this court from those claims that have little or no viability." *Porterfield v. Bell*, 258 F.3d 484, 487 (6th Cir. 2001); *see also Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001) (remanding motion for COA for district court's analysis of claims). Thus, in concluding this Opinion, it is now appropriate to determine whether to grant a COA as to any of the claims the Petitioner presented in his Petition pursuant to 28 U.S.C. § 2253. *Castro v. United States*, 310 F.3d 900 (6th Cir. 2002).

> 28 U.S.C. § 2253 states in relevant part:
>
> (c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from –
> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court
>
>       *  *  *
>
> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

This language is identical to the requirements set forth in the pre-AEDPA statutes, requiring the habeas petitioner to obtain a Certificate of Probable Cause. The sole difference between the pre- and post-AEDPA statutes is the petitioner now must demonstrate he was denied a constitutional right, rather than the federal right that was required prior to the AEDPA's enactment.

The United States Supreme Court interpreted the significance of the revision between the pre- and post-AEDPA versions of the statute in *Slack v. McDaniel*, 529 U.S. 473 (2000). In that case, the Court held that Section 2253 was a codification of the standard it set forth in *Barefoot v. Estelle*, 463

U.S. 880 (1983), but for the substitution of the word "constitutional" for "federal" in the statute. *Slack,* 529 U.S. at 483. Thus, the Court determined:

> To obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that, under *Barefoot,* includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.

*Id*. at 483-4 (quoting *Barefoot*, 463 U.S. at 893 n. 4) (internal quotation marks omitted).

The Court went on to distinguish the analysis a habeas court must perform depending upon its finding concerning the defaulted status of the claim.  If the claim is not procedurally defaulted, then a habeas court need only determine whether reasonable jurists would find the district court's decision "debatable or wrong."  *Id.* at 484.  A more complicated analysis is required, however, when assessing whether to grant a COA for a claim the district court has determined procedurally defaulted.  In those instances, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Id.*

After taking the above standard into consideration, the Court finds there are no issues meriting further review.  The Court discusses each claim and its defaulted status below.

Parts of Grounds One, Two, Four and Eight and Grounds Six and Seven are procedurally defaulted.  Ground One sub-claims (c) (failure to hire a forensic pathologist) and (e) (failure to hire a false confession expert) are barred because they were never presented to the Ohio courts.  Ground Two, sub-claim (a) (ineffective assistance of counsel for requesting a mental evaluation) is procedurally defaulted because it was never presented to the Ohio courts. Sub-claim (d) of Ground Two (failure to investigate the nature and extent of the trial judge's conflict) is procedurally barred by the doctrine of res judicata. Part of sub-claim (b) of Ground Four (counsel's delay in asking for

funds and waiting too long to tell Dr. Karpawich he was supposed to conduct the mitigation investigation) is procedurally defaulted because it was never presented to the Ohio courts.  Grounds Six (indictment failed to set forth each and every element of the felony murder enhancement in the five charges of aggravated murder and the death penalty specifications) and Seven (violation of *Miranda v. Arizona*) are barred by the contemporaneous objection rule.  Sub-claim (a) of Ground Eight (trial court improperly considered the absence of statutory mitigating factors not offered by Petitioner) is procedurally defaulted because it was not presented to the state courts under the same theory in which it is later presented in federal court.  Sub-claims (b) (trial court weighed the nature and circumstances of the offenses on the side of aggravation and therefore in favor of imposition of the death penalty) and (d) (trial court improperly weighed non-statutory aggravating circumstances) of Ground Eight are barred because they were never presented to the Ohio courts.  The Court finds that reasonable jurists would not debate the defaulted status of these claims as Foust has not shown cause and prejudice for default.  Thus, a COA is denied as to these grounds.

If the Court were to have considered the defaulted grounds, it would have found that jurists would not debate this Court's decision on the merits.

The Court finds jurists of reason would not debate this Court's decision as to the First Ground for Relief, sub-claim (c) (failure to hire a forensic pathologist), because Foust was not prejudiced by the decision of counsel not to hire another medical examiner whose testimony was likely to be similar to the State's witness.  A similar conclusion applies to Ground One, sub-claim (e) (failure to hire a false confession expert), because counsel is only required to conduct a reasonable investigation, and it appears Foust was given his *Miranda* rights before confessing.

The Court finds jurists of reason would not debate this Court's decision as to sub-claim (a) (ineffective assistance of counsel for requesting a mental evaluation) of the Second Ground for Relief

79

because the Court found this procedure enhances the search for the truth and does not render the proceedings unfair.  In sub-claim (d), Foust alleged ineffective assistance of counsel for failure to investigate the nature and extent of a conflict by one of the members of the three-judge panel. The Court finds jurists of reason would not debate this Court's decision as to this sub-claim because the Court found there would be no conflict as long as the judge had no involvement with Foust's case or any other case involving Foust, and he has not shown any particular facts demonstrating prejudice.

 The Court finds jurists of reason would not debate this Court's decision as to part of sub-claim (b) of Ground Four (the delay of counsel in asking for funds and waiting too long to tell Dr. Karpawich that he was supposed to conduct the mitigation investigation) because the trial court had sufficient evidence of Foust's background, including his dysfunctional family and history of abuse by his father, and he was not prejudiced by the use of Dr. Karpawich as a mitigation specialist.

In his Sixth Ground for Relief, Foust asserted his convictions and sentence are void because the indictment failed to set forth each and every element of the felony murder enhancement in the five charges of aggravated murder and the death penalty specifications. The Court finds jurists of reason would not debate this Court's decision as to this ground because indictments of the  underlying felonies contained the elements of the offenses, and reading the elements of those crimes together with the related felony-murder counts gave Foust sufficient notice of what the State had to prove to convict him.    In his Seventh Ground for Relief, Foust alleged a violation of *Miranda v. Arizona*.  The Court finds jurists of reason would not debate this Court's decision as to this ground because the facts showed his confession was not coerced, and the *Miranda* warnings need not be given in the exact wording set forth in *Miranda*.

The Court finds jurists of reason would not debate this Court's decision as to sub-claim (a) of the Eighth Ground for Relief (trial court improperly considered the absence of statutory mitigating

80

factors not offered by Petitioner) because the Court found the Ohio Supreme Court re-weighed the aggravating circumstances and mitigating factors.  No constitutional claim exists so long as the highest state court has independently re-weighed the aggravating circumstances and mitigating factors excluding the extra-statutory factors improperly relied on by the lower courts.  As to sub-claim (b) (trial court weighed the nature and circumstances of the offenses on the side of aggravation and therefore in favor of imposition of the death penalty), the Court finds jurists of reason would not debate this Court's decision because the court's comments were harmless.  It merely commented that the mitigating factors introduced by Foust did not outweigh the aggravating circumstances.  The Court finds jurists of reason would not debate this Court's decision as to sub-claim (e) (trial court failed to consider Petitioner's remorse for his actions) because the trial and appeals courts determined the weight to be given a mitigating factor, and the trial court in Foust's case did consider the fact he cooperated with the police after he was arrested and he showed remorse during his unsworn statement. Also, the court noted he had been hiding for a full week after the murder.

As to Foust's preserved claims, the Court finds jurists of reason would not debate this Court's decision as to Ground One, sub-claim (a) (arson investigator), because there was overwhelming evidence Foust started the fire in the Coreano home.  Absence of an arson expert most likely did not effect the outcome of the trial.  In sub-claim (b), Foust asserted his counsel was ineffective because they failed to hire a DNA expert.  The Court finds jurists of reason would not debate this Court's decision as to this sub-claim because a DNA expert might have reiterated the same conclusions presented by the State's witness. In sub-claim (d), Foust contended his counsel was ineffective for failing to utilize a mitigation specialist.  The Court finds jurists of reason would not debate this Court's decision as to this sub-claim because counsel did obtain the services of a mitigation specialist who testified during the sentencing phase of his trial.  His testimony was found to be adequate in  Foust's

81

Fourth Ground for Relief. The Court finds jurists of reason would not debate this Court's decision as to sub-claim (f) (failure to object to indictment) because in Foust's Sixth Ground for Relief, the Court found the indictment to be sufficient.  The Court finds jurists of reason would not debate this Court's decision as to sub-claim (g) (judge's potential conflict) because, although Judge Glickman was employed by the Cuyahoga County prosecutor, he had no other connection with Foust's case.

The Court finds jurists of reason would not debate this Court's decision as to sub-claim (b) (counsel was ineffective during the suppression hearing) of the Second Ground for Relief because there was abundant evidence Foust was given his *Miranda* rights, and he waived them, and defense counsel made a reasonable strategic decision not to put Foust on the stand. In sub-claim (c), Foust asserted his counsel failed to ensure Foust understood the consequences of his jury waiver. The Court finds jurists of reason would not debate this Court's decision as to this sub-claim because the Record reveals the trial court engaged in a colloquy to determine whether Foust knowingly, intelligently and voluntarily waived this right. He indicated he understood his right and that he did so voluntarily.

In his Third Ground for Relief, Foust contended that: (a) counsel failed to investigate and present evidence indicating specific other people were likely in the Coreano residence during the crimes; (b) inadequately prepared and incompetently cross-examined witnesses; (c) failed to object to the State's experts' qualifications and challenge their opinions; and (d) failed to pursue legal issues such as not requesting the merger of the rape and gross sexual imposition charges or constitutionally challenge Ohio Revised Code § 2901.21(C). The Court finds jurists of reason would not debate this Court's decision as to each sub-claim because: (a) there was no evidence anyone else was present in the house at the time of the murder, and strong evidence pointed to only Foust as the perpetrator; (b) decisions concerning whether to cross-exam and, if so, to what extent and how to conduct it are matters of trial strategy and generally will not support an ineffective assistance of counsel claim, and

82

the evidence against Foust was overwhelming; (c) the expert was qualified to testify as an expert in DNA analysis, and if there had been an objection, the prosecutor would have called the DNA analyst whose testimony would have been more detailed thereby bolstering the State's case. Also, a witness can testify to statistical conclusions about DNA evidence without being an expert in statistical analysis. As to sub-claim (d), the crimes of rape and gross sexual imposition were separate and distinct, and a criminal defendant is not constitutionally entitled to a voluntary intoxication defense.

In his Fourth Ground for Relief, sub-claim (a), Foust alleged trial counsel refused to object to the improper introduction of all trial phase exhibits at the mitigation phase. The Court finds that jurists of reason would not debate this Court's decision as to this sub-claim because errors involving state evidentiary matters, especially rulings regarding the admission or exclusion of evidence, usually are not reviewable in federal habeas corpus actions, and any possible error in readmitting trial phase evidence in the penalty phase, assuming it is error, is insufficient to warrant habeas corpus relief.

Foust alleged in his Fifth Ground for Relief he was deprived of his constitutional rights when records of the police and fire departments which identified additional suspects and provided material for impeachment of State witnesses were not disclosed by the State in violation of *Brady v. Maryland*. The Court finds jurists of reason would not debate this Court's decision as to this claim because any evidence of another person present in the home where the murder took place was not material because such evidence could not reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict, and Foust would have known if he acted alone and could have informed his counsel who then could have taken appropriate action.

In his Eighth Ground for Relief, Foust alleged the trial court: (a) improperly considered the absence of statutory mitigating factors not offered by Petitioner; (b) weighed the nature and circumstances of the offenses on the side of aggravation and therefore in favor of imposition of the

death penalty; (d) improperly weighed non-statutory aggravating circumstances; and (e) failed to consider Petitioner's remorse for his actions. The Court finds jurists of reason would not debate this Court's decision as to each sub-claim because: (a) no constitutional claim exists so long as the highest state court has independently re-weighed the aggravating circumstances and mitigating factors excluding the extra-statutory factors improperly relied on by the lower courts; (b) courts may consider the nature and circumstances of an offense in determining whether the aggravating factor(s) outweigh the mitigating circumstances, and the court merely commented the mitigating factors introduced by Foust did not outweigh the aggravating circumstances; (d) the court was merely summarizing the history of the case, and in its opinion made it clear in weighing the mitigating factors, it was only considering the aggravated circumstances proved at trial; and (e) the trial court in Foust's case considered the fact that he cooperated with the police after he was arrested and he showed remorse during his unsworn statement.

In his Ninth Ground for Relief, Foust alleged the cumulative effect of the many errors in his case require granting of his Petition. The Court finds jurists of reason would not debate this Court's decision as to this claim because no errors have been found, and the Sixth Circuit has noted the Supreme Court has not held distinct constitutional claims can be cumulated to grant habeas relief.

The Court finds that jurists of reason would not debate this Court's decision as to Foust's Tenth Ground for Relief (Ohio's death penalty is unconstitutional in many respects). All of these issues have been raised many times in other cases and have been found to be without merit.

For the reasons stated in this Opinion, this Court finds none of the claims asserted in Foust's Petition for a Writ of Habeas Corpus under 28 U.S.C. §2254 are well-taken. Accordingly, Foust's request for habeas corpus relief is **DENIED**. The Petition is hereby **DISMISSED**.

84

Further, the Court finds no claims to be debatable among jurists of reason as no ground for relief comes close to presenting a federal constitutional or legal violation. The Court finds that jurists of reason would not find the Court's decision as to procedural default to be debatable. Consequently, the Court **DENIES** a COA as to all claims for relief.

IT IS SO ORDERED.

                                          *s/ Jack Zouhary*
                                     JACK ZOUHARY
                                     U. S. DISTRICT JUDGE

                                     August 15, 2008